UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL ACTION CASE NO.: 9:21-cv-81826

DANIEL FERRO,

      Plaintiff,

v.

A-1 COLLECTIONS, LLC and
MOAB REGIONAL HOSPITAL

      Defendants.

_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT WITH JURY DEMAND

1.     Plaintiff, DANIEL FERRO (hereinafter "Plaintiff" or "Mr. Ferro") pursuant to Federal Rule of Civil Procedure 15(a)(2) files this First Amended Complaint against Defendant A-1 COLLECTIONS, LLC for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (hereinafter "FDCPA").

2.     Plaintiff further alleges that Defendant MOAB REGIONAL HOSPITAL has committed violations of the Florida Consumer Collection Practices Act § 559.72 *et seq.* (hereinafter "FCCPA").

3.     Plaintiff alleges as follows against A-1 COLLECTIONS, LLC, and MOAB REGIONAL HOSPITAL.

### JURISDICTION AND VENUE

4.     This is an action against A-1 and MOAB REGIONAL HOSPITAL for under the FDCPA and FCCPA, respectively.

5.     As it relates to Defendant A-1 COLLECTIONS, LLC this an action for statutory damages under the FDCPA that was removed by Defendant, A-1 [DE 4].

6.      As it relates to Defendant, MOAB REGIONAL HOSPITAL this is an action for statutory damages and punitive damages under the FCCPA for which MOAB REGIONAL HOSPITAL has consented to removal.

## PARTIES

7.      The Plaintiff is a natural person who, at all times relevant to this action, was and is a resident of Palm Beach County, Florida. Additionally, Plaintiff was and is a "consumer" as the term is defined by Florida Statute §559.55(2), and/or a person with standing to bring a claim under the FCCPA by virtue of being directly affected by the violations of the FCCPA.

8.      Plaintiff, who, as more fully described herein, is allegedly obligated to pay a debt and is therefore a consumer within the meaning of 15 U.S.C. § 1692a(3).

9.      Defendant, A-1 COLLECTIONS, LLC (hereinafter "A-1") is Colorado Corporation with minimum contacts in the in the state of Florida, which are more fully described below, and with a registered agent listed as Healthcare Management, LTD, Liability Co. at 715 Horizon Drive, Suite 485, Grand Junction, CO 81506.

10.      Defendant, MOAB REGIONAL Hospital (hereinafter "MOAB") is a Utah Corporation with minimum contacts in the state of Florida, which are more fully described below, and with a registered agent listed as Jennifer Sadoff located at 450 W Williams Way, MOAB, UT 84532.

11.      A-1 uses the mail and telephone in a business the principal purpose of which is the collection of debts. A-1 is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

12.      At all times material hereto, A-1 regularly collects or attempts to

collect debts for other parties and is a "debt collector" as defined under 15

U.S.C. 1692a(6).

13.     Defendant, Moab conducts business as a hospital and health care

provider in Salt Lake County, Utah.

14.     However, Moab's voluntary contact with Mr. Ferro, a Florida resident, in

connection with the collection of consumer debts not owed in Florida, made it foreseeable

that it would be haled into a Florida Court. *See Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 474 (1985).

15.     Similarly, A-1's voluntary contact with Mr. Ferro in Florida made it

foreseeable that it would be haled into a Florida court. *Id.*

### ***Long- Arm Jurisdiction***

16.     Florida's long-arm "appl[ies] to defendants committing tortious acts outside

the state that cause injury in Florida." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th

Cir. 1999). Accordingly, the long-arm statute confers personal jurisdiction over a nonresident

defendant who is alleged to have committed a tortious act in Florida, which causes injury to a

plaintiff. *Id.* at 1216. "[A] nonresident defendant may commit a tortious act within the state

by electronic, written, or telephonic communication into Florida so long as the cause of

action arises from such communication." *Smith v. Trans-Siberian Orchestra,* 728 F. Supp. 2d

1315, 1321 (M.D. Fla. 2010).

17.     A violation of a statute prohibiting unfair debt collection is a tortious act

because it breaches a duty imposed by law. *See Proescher v. Security Collection Agency,*

Case No. 3:17-CV-1052-J-32PDB, 2018 WL 3432737 (M.D. Fla. June 8, 2018) (citing *Vlach*

*v. Yaple*, 670 F. Supp. 2d 644, 648 (N.D. Ohio 2009); *See also Koch v. Lake City Credit, LLC,* Case No: 6:19-cv-667-Orl-41GJK (M.D. Fla. July 23, 2019).

18.     As such, specific jurisdiction exists over A-1 and Moab Fla. Stat. 48.193(1)(a)(2) because it committed out-of-state acts, that are codified torts under the FCCPA and FDCPA, which have caused damage to Plaintiff in Florida.

19.     Personal jurisdiction exists over A-1 and Moab because Plaintiff lives in the forum where he was injured by their actions. *See Koch* at *5 (citing *InternetSols. Corp. v. Marshall*, 39 So. 3d 1201, 1208 (Fla. 2010) (nonresidents can commit tortious acts in Florida by virtue of telephonic, electronic, or written communications into Florida)).  "[S]uits may be brought where a debtor receives a communication from a debt collector located elsewhere where the transmittal of those communications is claimed to have violated debt collection laws. *Alecca v. AMG Managing Ptnrs.*, *LLC*, No. 3:13-cv-163, 2014 WL 2987702, at *6 (M.D. Fla. Jul. 2, 2014) (quoting *Sluys v. Hand*, 831 F. Supp. 321, 324 (S.D.N.Y. 1993).

20.     Accordingly, A-1 and Moab have each created minimum contacts with this Forum by virtue of their telephonic, electronic, or written communications into Florida which violated the FCCPA and FDCPA.

## LEGAL BACKGROUND

## FLORIDA WORKERS' COMPENSATION LAW

21.    The Florida legislature enacted its workers' compensation law "to assure the quick and efficient delivery of disability and medical benefits to an injured worker . . . at a reasonable cost to the employer." *Fla. Stat.* § 440.015.

22. To achieve this objective, the statute "makes the employer and insurance carrier legally responsible for paying medical bills, while the employee is insulated from liability." *Sun Bank/S. Florida, N.A. v. Baker*, 632 So. 2d 669, 671 (Fla. 4th DCA 1994).

23. Thus, "[a] health care provider may not collect or receive a fee from an injured employee within this state, except as otherwise provided by this chapter." *Fla. Stat. §* 440.13(14)(a); *see also Fla. Stat.* § 440.13(3)(g) ("The employee is not liable for payment for medical treatment or services provided pursuant to this section."); Staff of Fla. S. Comm. on Commerce, PCS/SB 821, Staff Analysis 2 (April 24, 1987) ("[T]he injured employee is not responsible for paying for authorized medical treatment and services.")

24. "*Such providers have recourse against the employer or carrier for payment of services rendered in accordance within this chapter.* In accord with these statutes, claimant is shielded from liability in any dispute between the E/C and health care provider regarding reimbursement for claimant's authorized medical or psychological treatment." *See Avalon Center v. Hardaway*, 967 So.2d 268, 274 (Fla. 1st DCA 2007) (emphasis supplied).

25. Under Fla. Stat. §440.13(2)(a), an injured employee is entitled to "such medically necessary remedial treatment, care, and attendance for such period as the nature of the injury or the process of recovery may require." *Ascension Benefits v. Robinson*, 232 So. 3d 1178, 1180 (Fla. 1st DCA 2017).

**The FDCPA**

26. The FDCPA provides, in relevant part: A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: (2) The false

representation of -- (A) the character, amount, or legal status of any debt … 15

U.S.C. § 1692e.

27.     A consumer has a right under the FDCPA to receive information from a debt

collector that is not "false, deceptive, or misleading." *Pralle v. Cooling & Winter, LLC*, No. 2:

16-cv-865-FtM-99CM (M.D. Fla. May 2, 2017).

28.     The FDCPA defines the term "consumer" as "any natural person

obligated or <u>allegedly obligated</u> to pay any debt." 15 U.S.C. § 1692a(3) (emphasis

added).

29.     The FDCPA defines the term "debt" as "any obligation or <u>alleged

obligation</u> of a consumer to pay money arising out of a transaction in which the money,

property, insurance, or services which are the subject of the transaction are primarily for

personal, family, or household purposes, whether or not such obligation has been reduced to

judgment." 15 U.S.C. § 1692a(5) (emphasis added).

30.     The FDCPA defines the term "debt collector" as "any person who uses any

instrumentality of interstate commerce or the mails in any business the principal purpose of

which is the collection of any debts, or who regularly collects or attempts to collect, directly or

indirectly, debts owed or due <u>or asserted to be owed or due another</u>." 15 U.S.C. § 1692a(6)

(emphasis added).

31.     The FDCPA is essentially a strict liability statute and, therefore, does not require

a showing of intentional conduct on the part of a debt collector. *See Rivera v. Amalgamated

Debt Collection Services*, 462 F. Supp. 2d 1223 (S.D. Fla. 2006).

32.     For the purposes of the claims brought in this action, the applicable standard

under the FDCPA in the Eleventh Circuit is "the least sophisticated" consumer test. *See Jeter*

*v. Credit Bureau, Inc*., 760 F.2d 1168, 1175 (11ᵗʰ Cir. 1985) (adopting the test enunciated in Exposition Press Inc. v. *FTC*, 295 F.2d 869 (2d Cir. 1961)).

33.     The principles underlying the FDCPA must be implemented for "the public—that vast multitude which includes the ignorant, the unthinking and the credulous." *Jeter*, 760 F.2d at 1172-73 (internal citations omitted).   The "fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." Id. at 1173 (internal citations omitted).

### **The FCCPA**

34.     The FCCPA creates a private right of action under Fla. Stat. § 559.77.

35.     The FCCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." Fla. Stat. § 559.55(8).

36.     The FCCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *Id.* § 559.55(6).

37.     Consumer protection statutes are remedial in nature and should be liberally construed in favor of the public. *See Samara Dev. Corp. v. Marlow*, 556 So. 2d 1097, 1100 (Fla. 1990).

38.     The FCCPA's goal is to "provide the consumer with the most protection possible." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing Fla. Stat. § 559.552).

39.     The FCCPA mandates that "no person" shall engage in certain practices in collecting consumer debt. Fla. Stat. § 559.72. This language includes all unlawful attempts at collecting consumer debts by creditors and debt collectors alike. *See Williams v. Streeps Music Co.*, 333 So. 2d 65, 67 (Fla. 4th DCA 1976).

40.     Additionally, the FCCPA provides that no person shall "[c]laim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." Fla. Stat. §559.72(9).

## FACTUAL ALLEGATIONS

41.     The factual allegations of this Complaint stem from A-1's attempt to collect medical bills, on behalf of Moab, that are the legal responsibility of Mr. Ferro's employer and his employer's worker's compensation insurance carrier.

42.     The alleged debt at issue was incurred for personal, family, or household purposes. Specifically, the alleged debt was for previous medical care received by Plaintiff after he was injured while working for his employer, Group Voyagers, Inc. (hereinafter "Employer.")

43.     On or about May 14, 2017, Mr. Ferro was injured while at the hotel he was staying at for a business trip; Mr. Ferro is employed as a tour director and was in Salt Lake City, UT during this time.

44.     Mr. Ferro experienced bed bug bites and to Moab Regional Hospital to be treated for his injuries.  Before going to Moab Regional, Mr. Ferro called his employer's worker's compensation insurance carrier, Travelers Casualty and Insurance (hereinafter

"Travelers"), to notify them that he had been injured; he was given a claim number: FAE1667.

45.     When Mr. Ferro arrived at Moab Regional to get treatment for his injuries he informed Moab that he submitted a worker's compensation claim related to his injuries and provided the claim number.

46.     On or about May 18, 2017, Travelers sent a Fax to Moab requesting Mr. Ferro's medical records as part of its claim process. A redacted copy of the fax sent to Moab is attached hereto as part of Composite Exhibit "A."

47.     On or about May 24, 2017, Moab responded in kind by fax and included a cover page where it included the claim number provided by Travelers. A redacted copy of the fax communications between Travelers and Moab, without attachments, is attached hereto as part of Composite Exhibit "A."

48.     Notably, the fax from Travelers directed Moab to the billing information contained in the letter by stating "Traveler's billing information can be found in the upper right hand corner of this letter." *See* **Composite Exhibit "A."**

49.     Mr. Ferro returned to South Florida about one week later to continue getting treatment for his bed bug bites.

50.     In October 2017, Mr. Ferro began receiving bills from, AR Services, on behalf of Moab, demanding payment for the treatment he received on May 14, 2017. Using the information on the bill, Mr. Ferro contacted the department from Moab who sent the bill and provided all the necessary information to send the bills to Travelers.

51.     Then in December 2017, Mr. Ferro received a letter from A-1 demanding a payment of $197.00 for his visit to Moab Regional for his visit on May 14, 2017.

52.     On March 7, 2018, Mr. Ferro spoke with his assigned case manager at Travelers and sent a fax with attachments to show he was still receiving bills from debt collectors demanding payment for his injuries covered by his worker's compensation insurance carrier. A redacted copy of Mr. Ferro's fax with attachments to his case manager is attached hereto as Composite Exhibit "B."

53.     Mr. Ferro received a few more letters from A-1 in 2018 and 2019, but then the letters stopped, so he assumed the matter was resolved.

54.     Then, on or about January 8, 2021, a change was being reported to Mr. Ferro's Equifax and Trans Union credit files; a $250 debt appeared which was being reported by A-1 with Moab as the original creditor.

55.     On January 11, 2021, Mr. Ferro visited BMW of Fort Lauderdale (hereinafter "The Dealer") to lease a new vehicle. As a result, the Dealer reviewed Mr. Ferro's credit scores to evaluate him as a borrower.

56.     Generally, a consumer's credit "will not only affect whether [they] are approved for the lease, but also what interest rate [they will] pay. If your credit score qualifies you for a lower interest rate, your monthly payments will be less." *See What Credit Score Do I Need for a Car Lease?* https://www.experian.com/blogs/ask-experian/what-credit-score-do-i-need-for-a-car-lease/ (last visited August 25, 2021) (alterations added).

57.     Based on information and belief and within A-1's control, the $250 debt appeared on one or more of Mr. Ferro's credit files. However, since Mr. Ferro's credit score reached a certain threshold for the Dealer, his interest rate was not affected when the Dealer saw his credit score on January 11, 2021. Therefore, any possible risk of the debt on his any financial loss had dissipated by the time the lease was executed.

58.     On January 11, 2021, Mr. Ferro entered into a lease agreement with the Dealer with a base payment of $560.74 plus $39.25 in sales tax for a total monthly payment of $599.99, which is spread out over 36 months. A redacted copy of the lease agreement is attached as *Exhibit "B."*

59.     According to the lease agreement Mr. Ferro also paid $5,000.01 as a down payment, which was not affected by the $250 debt being reported by A-1 on behalf of Moab.

60.     Because Mr. Ferro was worried that this debt might affect him in future credit applications, he sent a dispute letter on or about May 10, 2021, to Trans Union and Equifax where he explicitly stated he did not owe the debt because it was a worker's compensation claim and provided supporting documentation. A redacted copy of Mr. Ferro's dispute letters to Trans Union and Equifax are attached hereto as **Composite Exhibit "C."**

61.     On May 19, 2021, A-1 responded to Mr. Ferro in writing and treated his disputes as a request for debt verification which stated in relevant part that A-1 had contacted Moab who confirmed Mr. Ferro's name, address listed on the account, and the amount owed. A redacted copy of A-1's May 19, 2021 response is attached hereto as **Exhibit "D."**

### COUNT I - VIOLATION OF §559.72(5) AGAINST MOAB<br>FOR DISCLOSURES TO A-1

62.      Plaintiff incorporates by reference paragraphs 2 - 4, 6, 7, 10, 13, 14, 16 – 25, and 34 – 61 as if fully set forth herein.

63.      At all times relevant to this action, Moab is subject to and must abide by the law of Florida, including Florida Statute § 559.72.

64.     Moab violated Florida Statute § 559.72(5) by disclosing to a person other than the Plaintiff or his family information affecting Plaintiff's reputation, whether or not for

credit worthiness, with knowledge or reason to know that the other person does not have a legitimate business need for the information or that the information is false.

65.     Specifically, Moab disclosed false information affecting Plaintiff's reputation to A-1: that Plaintiff owed money for medical bills to Moab even though such amounts are covered by Florida Worker's Compensation law.

66.     The disclosure of this false information from Moab to A-1 occurred on or about May 19, 2021, in response to Plaintiff's Initial Disputes. *See **Exhibits "C" and "D."***

67.     "Any person who fails to comply with any provision of s. 559.72 is liable for actual damages **and for additional statutory damages as the court may allow**, but not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff. In determining the defendant's liability for any additional statutory damages, the court shall consider the nature of the defendant's noncompliance with s.559.72, the frequency and persistence of the non-compliance, and the extent to which the noncompliance was intentional." Fla. Stat. 559.77(2) (emphasis added).

68.     As a result of Moab's violations, Plaintiff suffered damages, including but not limited to, time spent addressing Defendant's illegal collection practices, damage to his reputation for credit worthiness, and misrepresentation of an amount to a third party.

69.     Damages in the form of reputation being affected are the "class of injury where damages are difficult to prove and at the same time provide a penalty to dissuade parties . . . from engaging in collection practices which may have been heretofore tolerated industry wide." *See Laughlin v. Household Bank, 969 So. 2d 509, 513 (Fla. 1st DCA. 2007)* (quoting *Harris v. Beneficial Finance Company of Jacksonville*, 338 So.2d 196, 200 (Fla. 1976)). Accordingly, Plaintiff "is not required to prove actual damages, but only a violation of one of

the prohibited practices in the FCCPA." *Id.* "As discussed above, by enacting section 559.77, the Legislature intended to provide statutory damages in an area where the amount of damages are difficult to calculate." *Id.* at 514.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in his favor and against Moab for:

      a.      Statutory damages and punitive damages pursuant to Fla. Stat. §559.77;

      b.      attorneys' fees, litigation expenses and costs of the instant suit; and

      c.      such other or further relief as the Court deems proper.

## COUNT II – VIOLATIONS OF FLA. STAT. §559.72(9) AGAINST MOAB

70.     Plaintiff incorporates by reference paragraphs 2, 4, 6, 7, 10, 13, 14, 16 – 25, and 34 -61 as if fully set forth herein.

71.      At all times relevant to this action, Moab is subject to and must abide by the law of Florida, including Florida Statute § 559.72.

72.     The FCCPA defines communication as "the conveying of information regarding a debt directly or indirectly to any person through any medium." Fla. Stat. § 559.55(2).

73.     "Indeed, in accordance with the FCCPA's broad definition of "communication," this Court has interpreted the FCCPA to *permit* "on behalf of" liability. *See Kelliher v. Target Nat'l Bank*, 826 F. Supp. 2d 1324, 1329-30 (M.D. Fla. 2011) (denying the defendant's motion to dismiss the plaintiff's Section 559.72(18) claim where the plaintiff alleged that the defendant used a third party to send debt collection communications to the plaintiff despite knowing that the plaintiff was represented by counsel, because such

actions constituted indirect communications)." *See Mangiaracina v. Orange Lake Country Club, Inc.*, Case No: 8:14-cv-1166-T-36MAP, at *7-8 (M.D. Fla. Feb. 18, 2015).

74.     Moab violated Statute § 559.72(9) by indirectly communicating with Plaintiff through A-1 and "confirmed . . . the amount owed" after receiving sufficient notice such amounts were covered by worker's compensation insurance coverage. ***See Exhibit "C" and "D."***

75.     "Any person who fails to comply with any provision of s. 559.72 is liable for actual damages **and for additional statutory damages as the court may allow**, but not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff. In determining the defendant's liability for any additional statutory damages, the court shall consider the nature of the defendant's noncompliance with s.559.72, the frequency and persistence of the non-compliance, and the extent to which the noncompliance was intentional." Fla. Stat. 559.77(2) (emphasis added).

76.     As a result of Moab's violations, Plaintiff suffered damages, including but not limited to, time spent addressing Defendant's illegal collection practices, misrepresentation of an amount to a third party, and damage to his reputation for credit worthiness.

77.     Damages in the form of reputation being affected are the "class of injury where damages are difficult to prove and at the same time provide a penalty to dissuade parties . . . from engaging in collection practices which may have been heretofore tolerated industry wide." *See Laughlin,* 969 So. 2d at 513) (quoting *Harris*, 338 So.2d at 200. Accordingly, Plaintiff "is not required to prove actual damages, but only a violation of one of the prohibited practices in the FCCPA." *Id.* "As discussed above, by enacting section 559.77, the Legislature

intended to provide statutory damages in an area where the amount of damages are difficult to calculate." *Id.* at 514.

   WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in his favor and against Moab for:

   a. Statutory and punitive damages pursuant to Fla. Stat. § 559.77;

   b. attorneys' fees, litigation expenses and costs of the instant suit; and

   c. such other or further relief as the Court deems proper.

### COUNT III – VIOLATIONS OF 15 U.S.C. §1692e(8) AGAINST A-1

78.   Plaintiff incorporates by reference paragraphs 1, 3 -5, 7 – 9, 11, 12, 15 – 33, and 41 – 61.

79.   A "debt collector" violates 15 U.S.C. §1692e(8)  by "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."

80.   Plaintiff is not legally obligated to pay the debt at issue because it was the subject of a worker's compensation claim, which was fully covered by Travelers Insurance.

81.   A-1 communicated false credit information to at least Trans Union and Equifax on or about January 8, 2021, and January 11, 2021, the latter dates of which was Plaintiff's visit to the Dealer to lease a new vehicle.

82.   Therefore, A-1 violated §1692e(8) when it communicated false credit information to Trans Union and Equifax by stating a $250 balance was still due and owing even though Plaintiff was never legally obligated to pay such a debt.

83.      Additionally, Plaintiff put A-1 on notice of the worker's compensation claim in his Initial Disputes, but A-1 disregarded and ignored that information and instead chose to parrot whatever information was sent to it by Moab and reasserted the $250 was due.

84.      A-1's conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. *See Jeter* at 1194 (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

85.      A-1, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(8).

86.      15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

87.      As a result of A-1's violations, Plaintiff has suffered damages.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment

in his favor and against A-1 for:

      a.      statutory damages pursuant to 15 U.S.C. § 1692k;

      b.      Attorneys' fees, litigation expenses and costs of the instant suit; and

      c.      Such other or further relief as the Court deems proper.

### COUNT IV - VIOLATIONS OF 15 U.S.C. §1692e(2)(A) AGAINST A-1

88.      Plaintiff incorporates by reference paragraphs 1, 3 -5, 7 – 9, 11, 12, 15 – 33, and 41 – 61 as if fully set forth herein.

89.    A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. *Johnson v. Midland Funding, LLC*, 823 F.3d 1334 (11th Cir. 2016).

90.    A-1 violated § 1692e(2)(A) of the FDCPA by falsely representing the character, amount, and legal status of Plaintiff's alleged consumer debt in its communications to Trans Union and Equifax in January of 2021.

91.    Additionally, A-1 violated §1692e(2)(A) when it sent the the May 19, 2021, response to Plaintiff's Initial Disputes.

92.    Specifically, A-1 inaccurately reported and sought to collect amounts that Plaintiff is not liable for under Florida Worker's Compensation statutes. *See* Fla. Stat. 440.13(3)(g).

93.    A-1 through its agents, representatives, and/or employees acting within the scope of their authority, has violated the FDCPA in that A-1 has sought to collect debts that Plaintiff is not legally responsible for and has made a false representation of the legal status of the debt.

94.    A-1's conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. *Id.*; *See also LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1194 (11th Cir. 2010) (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

95.    The FDCPA is a strict liability statute and accordingly A-1's conduct need not have been intentional, Defendant's conduct violated the FDCPA regardless of its intentions. *See LeBlanc* at 1190.

96.     A-1, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(2)(a).

97.     15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

98.     As a result of Defendant's violations, Plaintiff suffered damages.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in his favor and against Defendant for:

a.      Statutory damages pursuant to 15 U.S.C. § 1692k;

b.      Attorneys' fees, litigation expenses and costs of the instant suit; and

c.      Such other or further relief as the Court deems proper.

## COUNT V – VIOLATION OF §1692e(10)
## AGAINST A-1

99.     Plaintiff incorporates paragraphs 1, 3 -5, 7 – 9, 11, 12, 15 – 33, and 41 – 61 as if fully set forth herein.

100.     A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. *Johnson v. Midland Funding, LLC*, 823 F.3d 1334 (11th Cir. 2016).

101.     A-1 has violated the FDCPA in that it has employed the use any false representation or deceptive means" in an attempt to collect a debt. 15 U.S.C. §1692e(10).

102.    Specifically, A-1's communications to Trans Union and Equifax was that Plaintiff owed $250 compared to the $189.48 provided for in the May 19, 2021 letter to Plaintiff.

103.    A-1 has sought to collect money composed of interest, not authorized by statute or contract, and by claiming such sums are due has made a false representation and used deceptive means to attempt to collect a debt.

104.    A-1 continuously sought to collect amounts that are Plaintiff is not liable for under Florida Worker's Compensation statutes. *See* Fla. Stat. 440.13(3)(g).

105.    A-1's conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. *Id.*; *See also LeBlanc* at 1194.

106.    A-1, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(10).

107.    15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

108.    As a result of Defendant's violations, Plaintiff suffered damages.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in his favor and against Defendant for:

    a.  Statutory damages pursuant to 15 U.S.C. § 1692k;

    b.  Attorneys' fees, litigation expenses and costs of the instant suit; and

    c.  Such other or further relief as the Court deems proper.

### COUNT VI – VIOLATION OF §1692f(1) AGAINST A-1

109.     Plaintiff incorporates paragraphs 1, 3 -5, 7 – 9, 11, 12, 15 – 33, and 41 – 61 as if fully set forth herein.

110.     §1692f(1) prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

111.     The subject debt resulted from a workplace injury, which was covered by workers' compensation insurance.

112.     A-1 violated §1692f(1) when it sent the May 19, 2021, response to Plaintiff's Initial Disputes by stating "we have contacted our client, Moab Regional Hospital, who has confirmed the name and address listed on the account, **as well as the amount owed.**" ***See Exhibit "D."*** (emphasis added).

113.     A-1 continuously sought to collect amounts that are Plaintiff is not liable for under Florida Worker's Compensation statutes. *See* Fla. Stat. 440.13(3)(g).

114.     A-1's conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. *Id.*; *See also LeBlanc* at 1194.

115.     A-1, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692f(1).

116.     15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

117.     As a result of Defendant's violations, Plaintiff suffered damages.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in his favor and against Defendant for:

    a.   Statutory damages pursuant to 15 U.S.C. §1692k;

    b.   Attorneys' fees, litigation expenses and costs of the instant suit; and

    c.   Such other or further relief as the Court deems proper.

## JURY DEMAND

118.    Plaintiff demands a trial by jury on all issues so triable

Date: October 15, 2021

*Respectfully Submitted,*

SHARMIN & SHARMIN, P.A.
830 North Federal Highway
Lake Worth, FL 33460
Telephone: 561-655-3925
Fax: 561-202-9041
Direct: 954-667-3096

/s/ Kevin Rajabalee
Kevin Rajabalee, Esq.
FBN: 119948
Email: kevin@sharminlaw.com
Eiman Sharmin, Esq.
FBN: 716391
Email: eiman@sharminlaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 15, 2021 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to the parties listed on the service list found below. I also certify that the foregoing document is being served this date via mail and/or some other authorized manner for those

counsel or parties, if any, who are not authorized to receive electronic notices of electronic

filing.

SERVICE LIST

Shepard, Smith, Kohlmyer & Hand, P.A.
Ernest H. Kohlmyer, III, Esq.
2300 Maitland Center Parkway, Suite 100
Maitland, FL 32751
Primary: SKohlmyer@shepardfirm.com

> /s/ Kevin Rajabalee
> Kevin Rajabalee, Esq.
> FBN: 119948

# **EXHIBIT A**



**Moab Regional Hospital**
450 West Williams Way
PO Box 988
Moab, UT 84532
Ph. (435) 719-3500
www.amhmoab.org

MOAB REGIONAL
H O S P I T A L

*FAX*

*DATE: May 24, 2017*
*TO:  Travelers*
*FAX;  877-806-1781*

*PAGES: 10  including this cover sheet*

*FROM:  Valorie Hauch*
*FAX:    435-719-3719*
*PHONE: 435-719-3706*

*RE: Ferro, Daniel* ▇▇▇▇▇▇ *Claim # FAE1667*

---

*CONFIDENTIAL STATEMENT*
*The documents contained in this facsimile transmission contain information, which may be
confidential.  These documents are intended only for the use of the individual or entity names on
this transmission cover sheet.  IF YOU ARE NOT THE INTENDED RECIPIENT and have received this
transmission mistakenly, YOU ARE HEREBY NOTIFIED that reading, copying, disclosing, or
distributing those documents, or taking any action based on the information contained within them,
is strictly prohibited, and that the documents should be returned to Moab Regional Hospital
immediately.  If you have received this facsimile in error, please notify us by telephone (435-719-
3704) immediately so that we can arrange to retrieve the transmitted documents at no cost to you.*



**TRAVELERS**
Travelers Indemnity Company

Rene Foote
Workers Compensation Claim Professional
P.O. Box 173762
Denver, CO 80217-3798
Phone: (800) 227-1538 ext. 7063
Fax: (877) 806-1781

Date: 5-18-17

Employee Name: Daniel Ferro
Claim Number: FAE1667
Employer Name: Group Voyagers Inc
DOB:
SS # xxx-xx-
DOI: 5-11-17
DOS:

Dear Med Records

Please provide the medical records for the initial date of service. Note that in the state of Utah, HIPPA doesn't apply to WC visits. Please fax the medical records to 877-806-1781. Traveler's billing information can be found in the upper right hand corner of this letter.

Sincerely,

Rene Foote
Travelers Insurance

# EXHIBIT B



Daniel Ferro
33426

BMW OF FORT LAUDERDALE
1441 S FEDERAL HWY
FT LAUDERDALE, FL, 33316
9545273800

Your Credit Score and the Price You Pay for Credit

| Your Credit Score | | | |
|---|---|---|---|
| **Your credit score** | Source : Equifax<br>Model : FACTA BEACON 09 – Auto Industry<br>Date : 2021-01-11 15:54:49 | Source : Experian<br>Model : FICO AUTO V8<br>Date : 2021-01-11 15:54:49 | Source : TransUnion<br>Model : FICO Auto 08<br>Date : 2021-01-11 15:54:49 |

| Understanding Your Credit Score | |
|---|---|
| **What you should know about credit scores** | Your credit score is a number that reflects the information in your credit report.<br>Your Credit score is a record of your credit history. It includes information about whether you pay your bills on time and how much you owe to creditors.<br>Your credit score can change, depending on how your credit history changes. |
| **How we use your credit score** | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| **The range of scores** | Scores range from a low of 250 to a high of 900.<br>Generally, the higher your score, the more likely you are to be offered better credit terms |
| **How your score compares to the scores of other consumers** | [Equifax] [Experian] [TransUnion]<br>% of consumers with scores in a particular range<br>Equifax: 0.0  8.2  23.1  31.1  25.1  12.5 — Score Range [250-[351-[501-[601-[701-[801- 350] 500] 600] 700] 800] 900]<br>Experian: 0.0  7.0  23.1  31.9  26.7  11.2 — Score Range [250-[351-[501-[601-[701-[801- 350] 500] 600] 700] 800] 900]<br>TransUnion: 0.0  7.9  21.5  30.3  27.5  12.7 — Score Range [250-[351-[501-[601-[701-[801- 350] 500] 600] 700] 800] 900] |

| Checking Your Credit Report | |
|---|---|
| **What if there are mistakes in your credit report?** | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency.<br>It is a good idea to check your credit report to make sure the information it contains is accurate. |
| **How can you obtain a copy of your credit report?** | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year.<br>To order your free annual credit report --.<br>*By telephone:* Call toll-free: 1-877-322-8228<br>*On the web:* Visit: www.annualcreditreport.com<br>*By mail:* Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's web site at http://www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to:<br>Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348-5281 |
| **How can you get more information?** | For more information about credit reports and your rights under federal law, visit Federal Reserve Board's web site at www.federalreserve.gov or the Federal Trade Commissions's web site at www.ftc.gov. |

X _____
Daniel Ferro

CUST# 503907
FORM# 58085

01/11/2021   07:44 pm

| LEASE AGREEMENT | BMW of Ft. Lauderdale | SALESPERSON |
|---|---|---|
| ORDER DATE | 1441 S Federal Hwy | BRIAN DENIGHT |
| 01/11/2021 | Ft Lauderdale, FL 33316 | DELIVERY DATE / TIME |
| | (954) 527-3800 | 01/11/2021   07:44 pm |

## LEASE ORDER

| LESSEE INFORMATION | CO-LESSEE INFORMATION | VEHICLE DESCRIPTION | |
|---|---|---|---|
| NAME DANIEL SILVA FERRO | NAME N/A | STOCK # M8B60539 | YEAR 2021 |
| STR | STREET N/A | MAKE BMW | MODEL M340I |
| CITY | CITY N/A | BODY | COLOR BLACK |
| STATE FL   ZIP | STATE N/A   ZIP N/A | SERIAL NO. | |
| HOME PHONE | HOME PHONE N/A | MILEAGE 19 | |
| WORK PHONE | WORK PHONE N/A | IN-SERVICE DATE 01/11/2021 | |
| CELL PHONE | CELL PHONE N/A | EMAIL | |

### IMPORTANT NOTICE - - READ CAREFULLY BEFORE SIGNING.

AS-IS and WITH ALL FAULTS. The only warranties applying to this vehicle are those offered by the manufacturer, or if applicable, by the manufacturer of the non-factory installed equipment. The Dealer expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability and implied warranty of fitness for a particular purpose and the Dealer neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this vehicle. Lessee shall not be entitled to recover from the Dealer any consequential damages, damages to property, damages for loss of use, loss of time, loss of profit, or income, or any other incidental damages.

Lessee _____   Co-Lessee: _____

### USED VEHICLE TRADE IN

| YEAR N/A | MAKE N/A | MODEL N/A | BODY STYLE N/A | COLOR N/A |
|---|---|---|---|---|
| MILEAGE N/A | SERIAL NO. N/A | | | BALANCE OWED N/A |

BALANCE OWED TO WHOM N/A

ADDRESS N/A

PHONE NO. N/A    ACCOUNT NO. N/A

PAYOFF GOOD TIL N/A    VERIFIED BY N/A

Lessee: N/A    Co-Lessee: N/A

Title and tag fees are estimates and any excess will be refunded by Dealer when registration is delivered and any shortage must be paid by Lessee when registration is delivered.

### ENTIRE AGREEMENT

Lessee acknowledges by Lessee's signature below that Lessee has read the front and back of this Agreement, understands the terms and agrees to the terms on the front and back of this Order. Unless stated in writing and signed by an authorized Dealer representative, the terms in this written document constitute the entire agreement, understanding and representations, express or implied, between Lessee and Dealer concerning (1) the terms and provisions of the vehicle lease transaction, and (2) the quality or nature of the vehicle leased pursuant to this Agreement. This Agreement supercedes all oral communications between the parties. Lessee expressly acknowledges that Dealer representatives have not made any representations to the Lessee, including verbal statements, concerning the history or the use of the vehicle, or concerning any prior damage to the vehicle or any prior repair work that may have been done to the vehicle being leased pursuant to this Agreement or as to the financing of the vehicle except as expressly set forth in writing. This Agreement may be modified or amended only by a written document signed by Lessee and an authorized representative of Dealer.

Lessee _____   Co-Lessee: N/A

### ARBITRATION OF DISPUTES AND WAIVER OF JURY TRIAL

Lessee and Dealer agree to submit any and all controversies or claims identified in this arbitration provision, where the amount in controversy, including attorney's fee claims, exceeds $5,000, arising out of or relating to this Agreement and all other agreements executed by Lessee and Dealer related to this vehicle lease transaction or related to any aspect of the transaction contemplated by this Agreement, to binding arbitration. Except as expressly set forth in this Agreement, it is the express intent of Lessee and Dealer that this arbitration provision applies to all disputes, including contract disputes, tort claims, including fraud claims and fraud in the inducement claims, statutory claims, including deceptive trade practices claims, and regulatory claims, that would not have arisen but for the vehicle purchase transaction and resulting relationship between Lessee and Dealer. If any controversy or claim described in the arbitration provision is determined, for any reason, to be ineligible for arbitration, then that controversy or claim shall instead be decided by a judge of a court of competent jurisdiction, without a jury. Lessee and Dealer knowingly and voluntarily waive their right to a trial by jury for all controversies and claims. Lessee and Dealer agree and understand that they are giving up the right to trial by jury and have a right to a jury trial whether the controversy or claim is decided by arbitration or by trial before a judge. Lessee and Dealer agree to the additional arbitration provisions on the reverse side of this Agreement.

Lessee _____   Co-Lessee: N/A

| ITEMIZATION OF GROSS CAPITALIZED COST | |
|---|---|
| AGREED UPON VALUE OF THE VEHICLE | 55191.03 |
| SALES/USE TAX & OTHER APPLICABLE TAXES | N/A |
| EXTENDED SERVICE PLAN/Mnt | 700.00 |
| OTHER PRODUCTS | N/A |
| ACQUISITION FEE | 925.00 |
| N/A | N/A |
| PREDELIVERY SERVICES | 599.00 |
| ELECTRONIC FILING FEE | N/A |
| TOTAL GROSS CAPITALIZED COSTS | 57715.03 |
| 1.  MONTHLY BREAKDOWN | |
| BASE PAYMENT | 560.74 |
| SALES TAX | 39.25 |
| TOTAL MONTHLY PAYMENT | 599.99 |
| 2.  TRADE EQUITY | |
| APPLIED AS CAPITAL COST REDUCTION | N/A |
| APPLIED TO FUNDS DUE AT DELIVERY | N/A |
| TOTAL TRADE EQUITY | 0.00 |
| 3.  FUNDS DUE AT LEASING | |
| DOWN PAYMENT | 5102.73 |
| SECURITY DEPOSIT | N/A |
| FIRST PAYMENT | 599.99 |
| PREDELIVERY SERVICES | N/A |
| ELECTRONIC FILING FEE | 149.00 |
| NEW TAG FEE | 208.54 |
| RENTAL SURCHARGE | 80.00 |
| FLORIDA NEW TIRE FEE & BATTERY FEE | 6.50 |
| ACQUISITION FEE | N/A |
| MOTOR VEHICLE WARRANTY TRUST FUND (new vehicles) | 2.00 |
| SALES TAX ON DOWNPAYMENT & FEES | 371.25 |
| FUNDS DUE AT LEASE SIGNING | 6500.01 |
| LESS: MANUFACTURER REBATE LESS: TRADE EQUITY APPLIED TO FUNDS DUE AT DELIVERY | 1600.00 |
| NET CASH ON DELIVERY | 5000.01 |
| 4.  GENERAL INFORMATION | |
| Purchase Option Price | 35667.10 |
| Delivery Date | 01/11/2021 |
| Termination Date | 01/10/2024 |
| Terms $ 599.99 | 36  months |
| Second Payment Due | 02/10/2021 |
| Excess Mileage Charges $ | .30 per mile |
| Mileage Allowance | 30,019 |
| Starting Mileage | 19 |

## THIS IS A LEASE AGREEMENT - THIS IS NOT A PURCHASE AGREEMENT
PLEASE REVIEW THESE MATTERS CAREFULLY AND SEEK INDEPENDENT PROFESSIONAL ADVICE IF YOU HAVE ANY QUESTIONS CONCERNING THIS TRANSACTION. YOU ARE ENTITLED TO AN EXACT COPY OF THE AGREEMENT YOU SIGNED.

### LESSEE ACKNOWLEDGEMENT

The lessee's offer is not accepted and the transaction is not consummated until (a) accepted in writing by an authorized Dealer representative in the space indicated below and (b) accepted by a responsible Lessee Company and (c) Lessee and Dealer have signed a Lease Agreement. Lessee, by Lessee's execution of this Lease Order, acknowledges that Lessee has read the material printed on the front and on the back hereof. Lessee agrees to terms on the back of this Lease Order as a part of this Lease Order, the same as if such terms were printed above Lessee's signature. Lessee certifies that Lessee is 18 years of age, or older and hereby acknowledges receipt of a copy of this Lease Order.

Lessee acknowledges that Lessee has not been induced to sign this Lease Order by any oral representation involving the condition or performance of the vehicle or any warranty relating to this vehicle or any representations contrary to the written terms of this Lease Order.

Lessee _____   Co-Lessee: N/A   Dealer: _____   Date: 01/11/2021

58088*1*LIB-FI

## ADDITIONAL TERMS AND CONDITIONS

1. As used in this Lease Order, the terms (a) "Dealer" shall mean the authorized Dealer to whom this Order is addressed and who signs hereto by the Dealer's acceptance of this Order as reflected on the reverse side, (b) "Lessee" or "Customer" shall mean the party or parties executing this Order as Lessee on the reverse side hereof and the person who is leasing the subject vehicle, (c) "Manufacturer" shall mean the company that manufactured the vehicle or chassis or other accessories, it being understood by Lessee and Dealer that Dealer is not the agent of the Manufacturer and that the Dealer and Lessee are the sole parties to this Order, and (d) "Vehicle Leased" or "Selected Vehicle" shall mean the vehicle identified on the reverse side which Lessee has selected to lease through Dealer and Lessee has progressed lease terms on this Order for consideration and possible acceptance by Dealer. Reference to the Manufacturer herein is for the purpose of explaining generally certain contractual relationships or obligations between the Dealer and the Manufacturer with respect to the motor vehicle.

2. TRADE-IN. If the used motor vehicle which has been traded in as part of the consideration for the motor vehicle lease transaction hereunder is not delivered to Dealer at the time this Agreement is executed and the dealership appraises the trade-in, then the used motor vehicle shall be reappraised when delivered and such reappraised value shall determine the allowances made for such used vehicle. If such reappraised value is lower than the original allowance shown on the front of this Order, Customer, may if dissatisfied therewith, pay to the Dealer the dollar amount of the initial trade allowance and retain the used motor vehicle or deliver the used motor vehicle and obtain payment credit for the reappraised value. Customer hereby authorizes Dealer to sell the trade-in prior to the consummation of the lease with the Customer. In the event that the lease transaction for the vehicle identified on the reverse side is not consummated and finalized and the Dealer has sold the trade-in, Dealer shall reimburse to Customer the actual cash value of the trade-in, using the average retail value reflected in the National Edition of the NADA Appraisal Guide as a guide, however Dealer may offset the value of the trade-in against any amounts owed to Dealer from Customer. The reference to "Gross Allowance for Trade-in" on the reverse side means the amount allowed by Dealer regarding such trade-in to be credited on behalf of Lessee to the lease transaction and is arrived at based upon the complete negotiation process between Dealer and Lessee and is not equivalent to the "cash value" of the trade-in vehicle.

3. Customer agrees to deliver to Dealer satisfactory evidence of title to any used motor vehicle traded in as part of the consideration for the lease vehicle ordered hereunder at the time of delivery of such used motor vehicle to Dealer. Customer warrants that any such used motor vehicle to be Customer's property free and clear of all liens and encumbrances except as specifically noted on this document. Dealer may pursue any and all legal remedies for Customer's breach of this paragraph. Customer shall immediately satisfy any liens or encumbrances on the trade-in vehicle upon notice of such liens and encumbrances from Dealer.

4. Customer acknowledges that sometimes new vehicles are delivered to Dealer from the Manufacturer with some in-transit damage to the vehicle and acknowledges that sometimes new vehicles are damaged from being moved on or around the Dealer's property. Customer acknowledges that Customer may not be advised if such minor damage occurs to a new motor vehicle and is repaired.

5. If Customer fails to take delivery of the Selected Vehicle and/or fails to make any payments for the lease of the Selected Vehicle as referenced on the reverse side, Dealer may retain as liquidated damages Customer's down payment and/or trade-in to offset the losses suffered by Dealer pursuant to Customer's breach. Dealer may pursue other legal remedies in addition to retaining the down payment and trade-in.

6. Dealer shall not be liable for failure to deliver or delay in delivering the vehicle ordered when such failure or delay is due, in whole or in part, to any cause beyond the control or without the fault or negligence of the Dealer.

7. Certain equipment and/or accessories, including, but not limited to radios, air conditioning and cruise control, may not be products of the Manufacturer. The warranty for these items are not through the Manufacturer. You should contact the vendor of such products to determine the warranty, if any, for such items.

8. ARBITRATION OF DISPUTES AND WAIVER OF JURY TRIAL. The party which invokes arbitration may choose one of the following arbitration organizations and its applicable rules: The National Arbitration Forum (www.arb-forum.com) or the American Arbitration Association (www.adr.org). The parties agree that in any arbitration proceeding both parties may take two depositions as defined by the Florida Rules of Civil Procedure, which may include the customer and any identified expert. Civil procedural rules for offers of judgment shall apply to any arbitration. Either party may demand arbitration of a claim by filing a written demand for arbitration along with a statement of the matter in controversy with the arbitration organization and simultaneously serving a copy upon the other party. Lessee and Dealer agree that the arbitration proceeding to resolve all disputes shall be conducted in the city where Dealer's business is located. The filing fees for the arbitration shall be paid by the filing party initiating the arbitration. The arbitrator's fees and any other "cost" normally taxable in a civil action shall be taxed by the arbitrator in favor of the prevailing party. The arbitration shall be adjudged by a single arbitrator and the arbitrator shall be selected by Dealer with the consent of Lessee. Each party shall pay their own attorney's fees, except that the arbitrator may award attorney's fees to a prevailing party of any contractual or statutory claim presented in the arbitration where such a fee award is authorized by the contract or statute involved. In any arbitration proceeding between Lessee and Dealer, the arbitrator shall determine any issue as to award of attorney's fees, including both entitlement to an award and the amount of an attorney's fees award including the adjudication of any offers of judgment or similar procedural rules set forth in Florida law. The parties waive their rights to have a judge decide the attorney's fees issues. Lessee waives Lessee's right to arbitrate a class action and/or to participate as a representative or member of any class of claimants pertaining to any claims subject to this arbitration provision. The parties agree that there shall be no class relief in arbitration. However, in the event that this waiver is unenforceable, the parties agree that any class action involving disputes as identified in this arbitration provision, shall be resolved through arbitration by a panel of three arbitrators, one selected by Dealer, one selected by class representatives and the third to be selected jointly by the two party chosen arbitrators. Further, the parties agree that if the above class action waiver is unenforceable, then any class action certification request shall be determined by a court of competent jurisdiction pursuant to the Florida or federal rules of civil procedures, as appropriate and the parties shall have all appellate rights arising from such judicial determination of class certification. The parties agree that all references to "Dealer" shall include Dealer's officers, agents and/or employees and Dealer's surety bonding company. The substantive and procedural law of the State of Florida, without regard to its conflict of

laws rules, shall apply to the arbitration proceedings and the parties agree to accept such jurisdiction. Notwithstanding the arbitration provisions in this Agreement, in regard to entitlement to possession of either the Selected Vehicle or the trade-in vehicle, either party may resort to a judicial determination of entitlement to possession of such vehicle, without waiving any right to demand arbitration with respect to all other controversies or claims between the parties as more specifically set forth in this Agreement. This paragraph is subject to the Federal Arbitration Act, 9 U.S.C.A. §1, et seq. If any provision or provisions of the "Arbitration of Disputes and Waiver of Jury Trial" section in this document are not valid according to any applicable law(s), such invalid provisions shall be severed from this Agreement and all other remaining provisions will nevertheless remain enforceable and the "Arbitration of Disputes and Waiver of Jury trial" shall survive the termination or rescission of this Agreement. In the event that the parties execute more than one arbitration clause as part of the vehicle lease transaction or related transactions, to the extent that other arbitration provisions conflict with or are inconsistent with the provisions in this Agreement, such conflicting or inconsistent provisions shall be severed from the agreement and the remaining provisions shall be enforceable. In the event that this Agreement is more specific in its application than other arbitration provisions in this Agreement shall supersede other arbitration provisions executed by the parties.

9. Customer, before or at the time of delivery or after delivery of the Selected Vehicle, agrees to execute such other forms of agreements or documents as may be required by the terms and conditions indicated on this Order, including documents to transfer title to Customer's trade-in as needed.

10. In any legal proceeding arising out of or related to this Agreement, including arbitration and judicial proceedings, the prevailing party in such dispute shall be entitled to recover their attorney's fees and costs, including appellate fees and costs from the non-prevailing party.

11. In the event that a conflict arises from the transaction reflected on the reverse side, the parties agree that Florida law applies. Further, the parties agree to venue in the Florida county where dealer's dealership is located.

12. In the event that Dealer or Dealer's agent in their sole discretion, deem that they have been furnished with any faulty, inaccurate, or false information of any kind by Lessee related to this transaction, either verbally or written, or if any payment due from Lessee to Dealer is not made as agreed (including submission of any dishonored checks from Lessee to Dealer), Lessee will promptly return the Selected Vehicle to Dealer upon demand by Dealer. Lessee authorizes Dealer to take whatever action Dealer deems necessary to restore possession of the Selected Vehicle to Dealer, including self-help, and agrees to pay Dealer for all costs, expense, losses and damages arising out of Lessee's possession of the vehicle, including but not limited to repossession company fees and reasonable attorney's fees and costs, including appellate fees and costs, whenever the services of an attorney are secured by Dealer to enforce these conditions. If a trade-in vehicle has been given by Lessee as part of this transaction and the trade-in has been sold by Dealer, Dealer shall reimburse to Lessee the actual cash value of the trade-in, using the average retail value reflected in the National Edition of the NADA Appraisal Guide as a guide, however Dealer may offset the value of the trade-in against any amounts owed to Dealer from Lessee, including the amount of any liens paid off by Dealer.

13. Dealer and Lessee agree that in a financed lease, the transaction and the retail installment contract is contingent upon the assignment of such retail installment contract from the Dealer to a lending institution and receipt of payment from a lending institution to Dealer. Lessee acknowledges that Dealer is not a lender for this transaction. If these conditions do not occur, then Lessee agrees to return the Selected Vehicle to the Dealer and Dealer agrees to refund all consideration received minus any amounts offset against costs, expense and losses incurred by Dealer arising from the failed transaction. If a trade-in vehicle has been given by Lessee as part of this transaction and the trade-in has been sold by Dealer, Dealer shall reimburse to Lessee the actual cash value of the trade-in, using the average trade-in value reflected in the National Edition of the NADA Appraisal Guide as a guide, however Dealer may offset the value of the trade-in against any amounts owed to Dealer from Lessee, including the amount of any liens paid off by Dealer.

14. If the vehicle transaction identified on the reverse side is not consummated, pursuant to the provisions of either paragraph 12 or 13 above, and Dealer notifies Lessee to return the Selected Vehicle to Dealer, Lessee shall pay to Dealer the sum of $50 per day for the use of the vehicle together with the costs of any excess wear and tear damage incurred after notice of return from Dealer to the Lessee.

15. The term "demonstrator" or "demo" means any new motor vehicle which is carried on the records of the Dealer as a demonstrator and is used by, being inspected or driven by the Dealer, his employees or agents or used by prospective customers for the purpose of demonstrating vehicle characteristics in the sale or display of motor vehicles sold by the Dealer. An "executive vehicle" is a vehicle purchased from the Manufacturer or a subsidiary of the Manufacturer and was used by the Manufacturer or its subsidiary or the Dealer for the commercial or personal use of their employees.

16. If the Customer has traded in a vehicle as part of this transaction, the Customer acknowledges and agrees that in the event that Dealer discovers that the vehicle traded in has a mileage discrepancy and/or has suffered frame damage and/or is a salvaged or rebuilt vehicle and/or that the title to such vehicle was previously branded as such or if under the laws of the State of Florida, a vehicle would be branded as such and the Customer has not disclosed, in writing, this previous history of the vehicle to the Dealer, then, the Customer agrees to reimburse to the Dealer the full amount of any trade allowance provided, within ten (10) days from any written demand by Dealer for such reimbursement. Dealer may recover all consequential and incidental damages suffered by Dealer arising from Customer's failure to disclose the trade-in vehicle conditions identified in this paragraph.

17. Customer acknowledges that Customer has inspected the physical condition of the Selected Vehicle and Customer is satisfied with the Vehicle's condition and Customer accepts the Selected Vehicle as equipped. Customer further acknowledges that Customer has test driven the Selected Vehicle to Customer's satisfaction or has been offered an opportunity to do so.

18. Various incidental items, services or products, such as extended service agreements, may be sold by Dealer to Customer in conjunction with the lease of the vehicle. The amount charged to the Customer by Dealer may be greater than Dealer's costs.

01/11/2021   07:44 pm

# BMW Financial Services NA, LLC
## Motor Vehicle Lease Agreement (Closed End) - Florida

DEAL# 152409
STK # M8B60539
CUST# 603907
FORM# 70680  LIB-FI

### 1. PARTIES

| Lessor (Center) Name and Address | Lessee and Co-Lessee Name and Address | Vehicle Garaging Address (If Different) |
|---|---|---|
| BMW OF FORT LAUDERDALE<br>1441 S FEDERAL HWY<br>FT LAUDERDALE FL 33316 | DANIEL SILVA FERRO<br>█████████ 33426 | N/A<br><br>Billing Address (if Different)<br>N/A |

**2. Agreement to Lease.** This Motor Vehicle Lease Agreement ("Lease") is entered into between the lessee and co-lessee ("Lessee") and the lessor ("Lessor") named above. Unless otherwise specified, "I," "me" and "my" refer to the Lessee and "you" and "your" refer to the Lessor or Lessor's assignee. "Vehicle" refers to the leased vehicle described below. "Assignee" refers to BMW Financial Services NA, LLC ("BMW FS") or, if this box is checked ☒ to Financial Services Vehicle Trust. BMW FS will administer this Lease on behalf of itself or any assignee. The consumer lease disclosures contained in this Lease are made on behalf of Lessor and its successors or assignees.

**3. Date of Lease, Lease Term and Scheduled Maturity Date.** This Lease is entered into on __01/11/2021__ for the scheduled Lease Term of __36__ months with a Scheduled Maturity Date of __01/10/2024__.

### 4. VEHICLE DESCRIPTIONS

| A. Leased Vehicle<br>☒ New  ☐ Demo<br>☐ Used | Model Year<br>2021 | Make & Model<br>BMW<br>M340I | VIN<br>████████ | Odometer<br>19 | Primary ☒ Personal, Family or Household<br>Use:  ☐ Business, Commercial or<br>Agricultural |
|---|---|---|---|---|---|
| ☐ CD Player | ☐ N/A (specify) | | ☐ N/A (specify) | ☐ N/A (specify) | |

| B. Trade-In | Model Year<br>N/A | Make<br>N/A | Model<br>N/A | Agreed Upon Value<br>N/A | Prior Credit or Lease Balance<br>N/A | Net Trade-In Value<br>N/A |
|---|---|---|---|---|---|---|

### 5. AMOUNT DUE AT LEASE SIGNING OR DELIVERY
(Itemized in Section 9)

$ __6500.01__

### 6. MONTHLY PAYMENTS

My first monthly payment of $ __599.99__ is due on 01/11/21 followed by __35__ payments of $ __599.99__ due on the __10th__ day of each month. The total of my monthly payments is $21599.64

### 7. OTHER CHARGES
(Not part of my Monthly Payments)

| | |
|---|---|
| A. Disposition Fee (If I do not purchase the Vehicle) | $ 350 |
| B. N/A | $ N/A |
| TOTAL | $ 350.00 |

### 8. TOTAL OF PAYMENTS
(The amount I will have paid by the end of the Lease Term)

$ 27849.66

### 9. ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY

**A. Amount Due at Lease Signing or Delivery**

| | | |
|---|---|---|
| 1. Capitalized Cost Reduction | $ | 5102.73 |
| 2. First Monthly Payment | $ | 599.99 |
| 3. Refundable Security Deposit | $ | N/A |
| 4. Initial Title Fees | $ | N/A |
| 5. Initial Registration Fees | $ | N/A |
| 6. Initial License Fees | $ | 208.54 |
| 7. Sales/Use Tax | $ | 15.09 |
| 8. Acquisition Fee (if not capitalized) | $ | N/A |
| 9. Sales Tax on Capitalized Cost Reduction | $ | 356.16 |
| 10. FL Rental Schg | $ | 60.00 |
| 11. MVWEA | $ | 2.00 |
| 12. N/A | $ | N/A |
| 13. Tire Fee  5.00 / Battery Fee  1.50 | $ | 6.50 |
| 14. N/A | $ | N/A |
| 15. *ELECTRONIC FILING FEE | $ | 149.00 |
| TOTAL | $ | 6500.01 |

**B. How the Amount Due at Lease Signing or Delivery Will Be Paid**

| | | |
|---|---|---|
| 1. Net Trade-In Allowance | $ | N/A |
| 2. Rebates and Noncash Credits | $ | 1500.00 |
| 3. Amount to be Paid in Cash | $ | 5000.01 |
| TOTAL | $ | 6500.01 |

*Charge represents costs/profit to dealer for items such as inspecting, cleaning, and adjusting vehicles, and preparing lease documents.

### 10. MY MONTHLY PAYMENT IS DETERMINED AS SHOWN BELOW

A. **Gross Capitalized Cost.** The agreed upon value of the Vehicle ($ __55191.03__) and any items I pay for over the Lease Term (such as taxes, fees, service contracts, insurance, and any outstanding prior credit or lease balance) (See Section 13 for an itemization of this amount). $ __57715.03__

B. **Capitalized Cost Reduction.** The amount of any net trade-in allowance, rebate, noncash credit, or cash I pay that reduces the Gross Capitalized Cost. − $ __5102.73__

C. **Adjusted Capitalized Cost.** The amount used in calculating my Base Monthly Payment. = $ __52612.30__

D. **Residual Value.** The value of the Vehicle at the end of the Lease used in calculating my Base Monthly Payment. − $ __35667.10__

E. **Depreciation and any Amortized Amounts.** The amount charged for the Vehicle's decline in value through normal use and for other items paid over the Lease Term. = $ __16945.20__

F. **Rent Charge.** The amount charged in addition to the Depreciation and any Amortized Amounts. + $ __3241.44__

G. **Total of Base Monthly Payments.** The Depreciation and any Amortized Amounts plus the Rent Charge. = $ __20186.64__

H. **Lease Payments.** The number of payments in my Lease. ÷ __36__

I. **Base Monthly Payment.** = $ __560.74__

J. **Monthly Sales/Use Tax.** + $ __39.25__

K. **N/A** + $ __N/A__

L. **Total Monthly Payment.** = $ __599.99__

**Early Termination.** I may have to pay a substantial charge if I end this Lease early. The charge may be up to several thousand dollars. The actual charge will depend on when the Lease is terminated. The earlier I end the Lease, the greater this charge is likely to be.

**11. Excessive Wear and Use.** I may be charged for excessive wear based on your standards for normal use and for mileage in excess of total miles over the scheduled Lease Term of __30,000__ miles, at the rate of __.30__ cents per mile.

**12. Purchase Option at End of Lease Term.** I have an option to purchase the Vehicle ("as is") at the Scheduled Termination of the Lease for its Residual Value of $ __35667.10__. The purchase option price does not include: (i) official fees, such as those for taxes, title, registration and license/tags, and (ii) a Purchase Option Fee of $ __N/A__. See Section 27 for more information.

**Other Important Terms.** See all pages of this Lease for additional information on early termination, purchase options, and maintenance responsibilities, warranties, late and default charges, insurance, and any security interest, if applicable.

01/11/2021  07:44 pm

2202.. (09/18) (FL)   70680*1*LIB-FI   1 of 7

DEAL # 152409

## 13. ITEMIZATION OF GROSS CAPITALIZED COST

| | | | | | |
|---|---|---|---|---|---|
| A. Agreed Upon Value of the Vehicle | $ 55191.03 | O. Other N/A | | $ | N/A |
| B. Initial Title, License & Registration Fees | $ N/A | P. Other N/A | | $ | N/A |
| C. Sales/Use Tax | $ N/A | Q. Other N/A | | $ | N/A |
| D. Federal Luxury Tax | $ N/A | R. Other N/A | | $ | N/A |
| E. Sales Tax on Capitalized Cost Reduction | $ N/A | S. Other N/A | | $ | N/A |
| F. Maintenance Agreement | $ 700.00 | T. Other N/A | | $ | N/A |
| G. Mechanical Breakdown Protection | $ N/A | | | | |
| H. Extended Warranty | $ N/A | | | | |
| I. Prior Credit or Lease Balance | $ N/A | TOTAL | | $ | 57715.03 |
| J. Pre-Delivery Service Charge** | $ 899.00 | | | | |
| K. Acquisition Fee | $ 925.00 | **This charge represents costs and profit to the dealer for items such as | | | |
| L. Other N/A | $ N/A | inspecting, cleaning, and adjusting vehicles, and preparing documents | | | |
| M. Other N/A | $ N/A | related to the lease. | | | |
| N. Other N/A | $ N/A | | | | |

## 14. ESTIMATED OFFICIAL FEES AND TAXES

$ 2411.87 This is an estimate of the total amount I agree to pay for official and license fees, registration, title and taxes (including personal property taxes) over the Lease Term, whether included in my Monthly Payment, Amount Due at Lease Signing or Delivery, or separately billed. The actual total of Official Fees and Taxes may be higher or lower, depending on the tax rates in effect or the value of the Vehicle at the time a fee or tax is assessed. This estimate is based on my Garaging Address and may increase if I move or if tax rates change. For some of these items, you may invoice me after the taxing authority has billed you, sometimes after the lease terminates.

## 15. OPTIONAL PRODUCTS AND SERVICES

I am not required to buy any of the optional products and services listed below. These products and/or services will not be provided unless I check the appropriate box, fill in all necessary information, initial below and I am accepted by the provider. Because these products and/or services are not provided by the Lessor, I understand that I must pursue all related matters, including refunds, through the listed Provider. By initialing below, I agree that I have received and read a notice of the terms of the product or service and I want to obtain the product or service for the charge shown. A portion of the charge may be retained by Lessor (Center).

| ☑ Maintenance Agreement | BMW MAINTENANCE | 36 | $ 700.00 | N/A |
|---|---|---|---|---|
| | Provider | Term (Months) | Charge | Lessee/Co-Lessee Initials |
| ☐ Mechanical Breakdown Protection | N/A | N/A | $ N/A | N/A N/A |
| | Provider | Term (Months) | Charge | Lessee/Co-Lessee Initials |
| ☐ N/A | N/A | N/A | $ N/A | N/A N/A |
| | Provider | Term (Months) | Charge | Lessee/Co-Lessee Initials |

**Mileage Allowance/Refund.**

30,000 I agree to this Mileage Allowance for the term of this Lease. My Monthly Payment and Residual Value for this Lease have been calculated, in part, by
Enter Mileage   using this Mileage Allowance.
☐ If this box is checked, I have elected a high Mileage Allowance. I may receive a refund of N/A cents per unused mile for the unused miles between N/A miles and N/A miles, unless (a) the Vehicle is destroyed or stolen, (b) I default or terminate this Lease early, (c) I purchase the Vehicle, or (d) the refund is less than $1. Any refund will be reduced by any amount I owe under this Lease at the Scheduled Termination.

## 16. WARRANTIES

The Vehicle is subject to the following express warranties. If the Vehicle is new, the Vehicle is subject to the standard manufacturer's new vehicle warranty. The Vehicle is also covered by the following, if checked:
☐ Remainder of the standard manufacturer's new vehicle warranty if the Vehicle is not a new vehicle.
☐ N/A

UNLESS A LESSOR'S WARRANTY IS DISCLOSED ABOVE, LESSOR, TO THE EXTENT PERMITTED BY LAW, (1) MAKES NO WARRANTIES OR REPRESENTATIONS, EITHER EXPRESSED OR IMPLIED, AS TO THE VEHICLE OR ANY OF ITS PARTS OR ACCESSORIES AND (2) MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS OF THE VEHICLE FOR ANY PARTICULAR PURPOSE. I ACKNOWLEDGE THAT I AM LEASING THE VEHICLE FROM THE LESSOR "AS IS."

## 17. INSURANCE DISCLOSURE AND VERIFICATION

The valid and collectible liability insurance and personal injury protection insurance of any authorized rental or leasing driver is primary for the limits of liability and personal injury protection required by §§ 324.021(7) and 627.736, Florida Statutes.

I agree to maintain the insurance coverage described in Section 20. I affirm that such insurance is in force on the date of this Lease. I authorize Lessor and its assignees to speak to my insurance agent or company, and any future insurance agents or companies, about my coverage for the leased Vehicle.

| Insurance Company | Policy No. | Coverage Verified (Center Employee's Initials) |
|---|---|---|
| | | 561/994-9333 |
| Agent Name | Address | Phone No. |

All matters regarding insurance should be sent by e-mail to insuranceinfo@bmwfs.com; or faxed to (888) 725-8456

70680*1*LIB-FI

01/11/2021  07:44 pm

2202L (09/18) (FL)

2 of 7

**18. Vehicle Use.** I agree not to use (or permit others to use) the Vehicle: (a) in any way that violates the law or the terms of my insurance policy or this Lease; (b) to transport goods or people for hire, lease or rental to others; (c) outside the state where it was first titled for more than 30 days without my prior written consent; or (d) outside the United States, except for less than 30 days in Canada. I will not allow an uninsured person to operate the Vehicle at any time, or allow any third party, other than my spouse, to operate the Vehicle without written permission from you. I will not physically change the Vehicle's body or interior in any way unless I first get your written consent.

**19. Vehicle Maintenance, Service, Repairs, and Reconditioning.** I agree to maintain, service, repair, and recondition the Vehicle during the Lease Term with new and genuine manufacturer's original equipment replacement parts as recommended in the Vehicle owner's manual. I will keep complete maintenance records and return them with the Vehicle.

I am responsible for repairs of all collision, accident, and other physical damage that is not a result of normal wear and use. These repairs include, but are not limited to, those necessary to return the Vehicle to its pre-damage condition, including, but not limited to, repairing damage to exterior panels and components, structural components, vehicle safety systems such as airbag systems and seatbelts, and the Vehicle's interior. All repairs must be made with new and genuine manufacturer's original equipment replacement parts. I will discuss these requirements with my insurance company prior to signing my insurance agreement, damage repair estimate, or before authorizing any damage repair work. If I have not had the repairs made before the Vehicle is returned at or before the end of the scheduled Lease Term, I will pay the estimated cost of such repairs to restore the Vehicle to its pre-damage condition, regardless of whether the repairs are made after the Vehicle is returned.

If the Vehicle's odometer becomes inoperative or malfunctions, I agree to notify you and have the odometer repaired within 30 days. I agree not to make any alterations that decrease the Vehicle's value or usefulness or that violate the law. If I add non-standard equipment to the Vehicle, I will return it to original manufacturer specifications before the end of the Lease Term. If the non-standard equipment cannot be removed or modified without decreasing the Vehicle's value or usefulness when the Vehicle is returned to you, the equipment will become your property, and I may be billed in accordance with Section 32 below. You may inspect the Vehicle at any reasonable time.

**NO PHYSICAL DAMAGE OR LIABILITY INSURANCE COVERAGE FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS IS INCLUDED IN THIS LEASE.**

**20. Required Insurance.** During the term of this Lease and until I return the Vehicle, I agree to insure the Vehicle through liability policies acceptable to you. The liability insurance must (a) cover at least $50,000 for property damage, $100,000 for bodily injuries to any one person, and $300,000 for bodily injuries for any one accident, or (b) have a combined single limit of at least $500,000 for bodily injuries and property damage for any one accident. I also agree to maintain (a) comprehensive liability, including fire and theft, for the Vehicle's actual value (payable in cash and not by a replacement vehicle) with a maximum deductible of $1,000, and (b) collision liability for the Vehicle's actual value (payable in cash and not by a replacement vehicle) with a maximum deductible of $1,000. The policies will name you as an additional insured and loss payee. I will provide you with at least 30 days advance notice of cancellation. You have the right to endorse my name on any insurance check or settlement you receive. You also have the right to speak to my insurance company about my insurance coverage.

Except to the extent required by the motor vehicle financial responsibility laws of the applicable state or otherwise by law, I acknowledge that you do not extend any of your motor vehicle financial responsibility or provide insurance coverage to me, any authorized additional driver(s), passengers or third parties through this Lease. If valid automobile liability insurance or self insurance is available on any basis for me, additional authorized driver(s) or any other driver and such insurance or self insurance satisfies the applicable state motor vehicle financial responsibility law, then you extend none of your motor vehicle financial responsibility. However, if I and any additional authorized driver(s) are in compliance with the terms and conditions of this Lease and if you are obligated to extend your motor vehicle financial responsibility to me, any additional authorized driver(s) or third parties, then your obligation is limited to the applicable state minimum financial responsibility amounts. Unless required by law, your financial responsibility shall not extend to any claim made by passenger while riding in or on or getting in or out of the Vehicle. Your financial responsibility shall not extend to liability imposed or assumed by anyone under any worker's compensation act, plan or contract.

Except as required by law, you do not provide Personal Injury Protection, No Fault Benefits or Medical Payment Coverage (PIP) or Uninsured/ Underinsured Motorist Protection (UM/UIM) through this Lease. If you are required by law to

provide PIP and/or UM/UIM, I expressly select such protection in the minimum limits with maximum deductible and expressly waive and reject PIP and/or UM/UIM limits in excess of the minimum limits required by law.

**21. Registration, Titling, and Taxes.** I agree to pay registration, title, license, inspection fees and other official fees and taxes in connection with the Vehicle when due. You may, at your discretion, pay these fees or taxes to protect your interest in the Vehicle. If you pay such fees or taxes on my behalf, I agree to reimburse you when I am billed. If I fail to reimburse you within 60 days after I am billed, then I will pay you a monthly late charge, until the unpaid balance of the fees and taxes has been paid in full. The amount of each such late charge will not exceed 1.5% of the outstanding unpaid balance of the fees and taxes then due, or the maximum amount permitted by law, whichever is less. The remedies described in this Section 21 are in addition to any remedies you may have pursuant to Section 23.

If I move to another location during the Lease Term or it becomes necessary for you to correct any title or registration deficiencies, or to perfect your interest in the Vehicle, whether as a result of my failure to cooperate or other action or inaction on my part, I agree to pay you a $30 service charge in addition to the actual fees or taxes, unless prohibited by law, to process registration, title and license documents.

**22. Payments, Late Charge, Returned Payment Charge, Fines, and Traffic Tickets.** If you do not receive my total Monthly Payment within 10 days after it is due, I agree to pay a late charge of $30 or 5% of the amount of the payment that is late, whichever is greater, but not to exceed any limit under applicable law. If any payment is returned to you unpaid for any reason, or if any electronic debit authorization is not paid, I agree to pay you a $25 service charge per item when I am billed.

If you receive notice of any third-party charges related to the Vehicle (including but not limited to fines, traffic tickets, parking tickets, toll violations, towing fees, storage fees, or repair bills), I will pay you a $30 service charge per item whether or not you pay such third-party charges. You may, at your discretion, pay these charges to protect your interest in the Vehicle. If you pay such charges on my behalf, I agree to reimburse you when I am billed. If I fail to reimburse you within 60 days after I am billed, then I will pay you a monthly late charge, until the unpaid balance of such third-party charges has been paid in full. The amount of each such late charge will not exceed 1.5% of the outstanding unpaid balance of the fees and taxes then due, or the maximum amount permitted by law, whichever is less. I further agree to pay you any and all costs you incur associated with my failure to pay such fines, charges or traffic tickets, including legal costs and reasonable attorneys' fees as allowed by applicable law. The remedies described in this Section 22 are in addition to any remedies you may have pursuant to Section 23.

**23. Default and Remedies.** I will be in default under this Lease if:

    (a) I fail to make a Monthly Payment when due;
    (b) I fail to maintain the required insurance;
    (c) I fail to return the Vehicle at the end of the Lease term;
    (d) I fail to keep any of my promises under this Lease;
    (e) I abandon the Vehicle;
    (f) I or a guarantor become(s) insolvent or die(s); or
    (g) Any information in my credit application or a guarantor's credit application is false or misleading; or
    (h) The Vehicle is subject to or threatened by seizure, confiscation, levy, or other involuntary transfer by governmental administrative or legal process.

If I am in default, you may do any or all of the following:

    (i) Terminate this Lease and my rights to possess and use the Vehicle;
    (ii) Take possession of the Vehicle by any method permitted by law;
    (iii) Pursue any other remedy permitted by law;
    (iv) Dispose of any personal or other property in the Vehicle at the time of repossession if I do not reclaim it within 10 days;
    (v) Require that I pay the sum of: (1) any past due Monthly Payments; plus (2) any official fees and taxes assessed or billed in connection with this Lease and the Vehicle and any other amounts needed to satisfy my obligations under this Lease except Excess Wear and Use and Excess Mileage charges; plus (3) the amount by which the Adjusted Lease Balance (explained in Section 30) exceeds the Realized Value of the Vehicle (Section 31); plus (4) all of your expenses for taking these actions, including, but not limited to expenses for repossession, transportation, storage, and/or sale of the Vehicle ; plus (5) all fees and costs of collections, including reasonable attorneys' fees, court costs, interest, and other related expenses for all losses you incur in connection with my default of this Lease. Furthermore, if I do not pay these amounts when you ask, you may charge me interest at a rate not exceeding the highest lawful rate until I pay;
    (vi) If the vehicle has an electronic tracking device, I agree that you may use the device to find the Vehicle.

01/11/2021  07:44 pm

**24. Vehicle Loss or Damage.** I agree to immediately notify you if the Vehicle is damaged or destroyed in an accident, stolen, abandoned, or taken by a police or other governmental agency. In that event, you reserve the right to terminate this Lease and my liability will either be: (a) calculated under Section 25 below, if I am in compliance with my insurance obligations; or (b) calculated under Section 23 above, if I am not in compliance with my insurance obligations. If the Vehicle is stolen or destroyed, another vehicle may be substituted in its place only if you agree to the substitution. You have no obligation to provide a substitution vehicle. If the Vehicle is damaged and you do not terminate this Lease because the Vehicle is reasonably repairable, I agree to make the repairs in accordance with Section 19 above at my expense.

**25. "Gap Amount" Waiver.** If I am in compliance with my insurance obligations under this Lease and the Vehicle is damaged, stolen or destroyed and considered a total loss under my insurance coverage, I will not be obligated to pay you the gap amount (the difference between the Adjusted Lease Balance and the actual cash value of the Vehicle as of the date of loss) if the claim for total loss is actually paid to you by my insurance company. However, I will be obligated to pay you: (1) any and all amounts due and owing needed to satisfy my obligations under this Lease (including past due Monthly Payments and any official fees and taxes assessed or billed in connection with this Lease and the Vehicle); plus (2) amounts (including Monthly Payments) that become

DEAL# 152409

due pending receipt of the insurance proceeds, plus (3) the deductible amount under my insurance policy, plus (4) any amounts deducted from the actual cash value of the Vehicle by the insurance carrier. If as of the date of loss, I do not have a physical damage insurance policy that complies with the insurance requirements set forth in this Lease, no gap amount waiver applies and the amount of my liability will be determined as set forth in Section 23.

**26. Power of Attorney.** I appoint you, to the extent permitted by law, through your officer or employee, as my attorney-in-fact. My grant of this power of attorney is coupled with an interest, and is irrevocable until all obligations I owe under this Lease are paid in full. As my attorney-in-fact, you can sign on my behalf all Certificates of Ownership, Registration Cards, applications, affidavits, or any other documents required to register and properly perfect your interest in the Vehicle; transfer my entire interest in the Vehicle as part of a repossession and sale; act on my behalf in insurance matters relating to the Vehicle, including, but not limited to, the power to endorse insurance proceeds checks or drafts on my behalf; and cancel any Credit Life, Credit Disability, GAP Coverage, Extended Warranty, or other optional insurance financed under this Lease, and apply the refunded premium or cost to my outstanding balance if I am in default. Should an original power of attorney be necessary to accomplish any of the preceding, I agree to execute a separate identical power of attorney document and provide you with same.

## ENDING MY LEASE

**27. Purchase Option.** I have an option to purchase the Vehicle AS-IS, WHERE-IS. If I want to buy the Vehicle, I will notify you in advance and agree to complete any documents you require for the purchase. I also agree to re-register and re-title the Vehicle at my own expense in my name at the time I purchase it. If I fail to do so, you reserve the right to cancel the registration. At the Scheduled Termination of the Lease, the purchase price will be the Residual Value (Section 10.D). Prior to the end of the Lease Term, the purchase price will be the Adjusted Lease Balance (Section 30). In either case, I agree to also pay the following which are not included in the purchase price: (i) any other amounts due or outstanding under the Lease at the time of purchase such as any official fees, unpaid Monthly Payments or late charges, (ii) official fees, such as those for taxes, title, registration and license/tags, and (iii) a Purchase Option Fee as described in Section 12.

**28. Vehicle Return.** If I do not purchase the Vehicle, I agree to return it to the place you specify with all parts and accessories and in good working order. Upon return, I agree to complete and sign an odometer disclosure statement and a vehicle inspection report, which may be used in determining any excess wear and use and/or excess mileage. If I do not return the Vehicle at the end of my Lease Term, I am in default and will continue to pay an amount equal to the Monthly Payment for each month until the time that I return the Vehicle. Payment of this amount does not give me the right to keep the Vehicle nor does it automatically extend this Lease.

**29. Scheduled Termination of the Lease.** Unless I terminate my Lease early or purchase the Vehicle, my Lease will terminate on the Scheduled Termination Date, at which time, I agree to pay you: (a) a $350 Disposition Fee, plus (b) any unpaid Monthly Payments then due and other amounts needed to satisfy my obligations under this Lease, plus (c) Excess Mileage and Excess Wear and Use charges (Section 11), plus (d) any official fees or taxes assessed or billed in connection with this Lease.

**30. Early Termination of the Lease.** I may terminate this Lease at any time by purchasing the Vehicle (Section 27) or by returning the Vehicle to a location selected by you, if I am in full compliance with the Lease and satisfy all of my Early Termination obligations. If I do not purchase the Vehicle, I may choose one of the following options to determine my Early Termination liability:

**Option A.** I agree to pay the sum of : (1) all remaining Monthly Payments; plus (2) any past due Monthly Payments; plus (3) any official fees and taxes assessed or billed in connection with this Lease and the Vehicle and any other amounts needed to satisfy my obligations under this Lease; plus (4) any Excess Wear and Use and Mileage Charges; plus (5) a $350 Disposition Fee.

**Option B.** I agree to pay the sum of: (1) any past due Monthly Payments; plus (2) any official fees and taxes assessed or billed in connection with this Lease and the Vehicle and any other amounts needed to satisfy my obligations under this Lease except Excess Wear and Use and Excess Mileage charges; plus (3) a $350 Disposition Fee; plus (4) the amount by which the Adjusted Lease Balance (explained below) exceeds the Realized Value of the Vehicle (Section 31). However, should my Early Termination Liability calculated under this Option exceed what I would have owed had I selected Option A, you will waive the difference and my liability will be capped at Option A.

Under either option, you may apply some or all of my Security Deposit to what I owe and I will remain liable for personal property taxes that may be

assessed and/or billed after the Lease terminates.

The "Adjusted Lease Balance" is determined at any given time by subtracting the scheduled Base Monthly Payments earned through the early termination date from the Adjusted Capitalized Cost and adding to the difference the cumulative Rent Charge received through the early termination date. The Rent Charge is calculated according to the "constant yield method" for any time period up to and including the date on which this Lease terminates. Under the constant yield method, each month's rent charge is earned in advance by multiplying the constant rate implicit in the Lease times the Adjusted Lease Balance. The Rent Charge calculations are based on the assumption that Lessor will receive the Monthly Payments on the exact due dates and that the Lease goes to its full term.

**31. Realized Value of the Vehicle.** For the purpose of calculating my Early Termination liability (Section 30), the Realized Value of the Vehicle is (a) the price you receive for the Vehicle upon disposition in a commercially reasonable manner or (b) a price agreed to by you and me in a separate writing. If the Vehicle is a total loss as set forth in Section 24 above, the amount of any deductible and the proceeds of the settlement of the insurance claim you receive are the "Realized Value." The Realized Value may also be determined by an appraisal of the wholesale value of the Vehicle, which I may obtain, at my own expense from a professional, independent appraiser agreeable to both of us. If I obtain such an appraisal within 10 days after the Vehicle is returned to you, the appraisal will be the final and binding Realized Value.

**32. Excessive Wear and Use.** I agree to pay you the costs of all repairs to the Vehicle that are not the result of normal wear and use, whether or not you actually repair the Vehicle. Excessive wear and use includes, but is not limited to:

  (a) Inoperative electrical or mechanical parts;
  (b) Dented, scratched, chipped, rusted, pitted, broken or mismatched body parts, paint, vehicle identification items, trim or grill work;
  (c) Non-functioning, scratched, cracked, pitted or broken glass or lights;
  (d) Missing equipment, parts, accessories or adornments;
  (e) Torn, damaged, burned, or stained interior;
  (f) Repair of any damage that makes the Vehicle unlawful or unsafe to drive;
  (g) Damage due to installation or removal of non-manufacturer, aftermarket or replacement parts;
  (h) Damage (including damage to the engine) due to failure to maintain the Vehicle in accordance with Section 19; or
  (i) Tires with tread depth of less than 1/8" remaining at the shallowest point, and/or tires that are not all of the same grade, quantity or quality as those delivered with the Vehicle.

If I fail to pay any excess wear and use, excess mileage or other lease end charges within thirty days of the due date indicated on my end of lease bill, I will pay you interest on the unpaid balance of these charges at the rate of 18 percent per annum, if permitted by law, or the maximum rate permitted, until paid in full.

I agree to pay state and local taxes that may be due on amounts owed for lease end charges, including but not limited to excess wear and use and excess mileage fees.

**33. Indemnification.** I agree to indemnify, defend and hold you harmless from all claims, liabilities, suits, losses, damages and expenses (including attorney's fees and legal expenses) arising out of the condition, maintenance, use, ownership or operation of the Vehicle, including claims made under the strict liability doctrine.

**34. Refundable Security Deposit.** You may use some or all of my Security Deposit to pay any amount I owe under this Lease at the end of my Lease Term or upon early termination of the Lease. I will not earn any interest on my Security Deposit. After I have paid all my obligations under this Lease, you will refund to me any part of my Security Deposit that is not used to pay what I owe you.

**35. Assignment.** You may assign your interests under this Lease without my consent. I MAY NOT TRANSFER OR SUBLEASE THIS VEHICLE TO A THIRD PARTY OR ASSIGN THE LEASE OR ANY RIGHTS UNDER IT WITHOUT YOUR PRIOR WRITTEN APPROVAL, WHICH YOU MAY WITHHOLD IN YOUR SOLE JUDGMENT.

**36. Notices.** All correspondence and notices will be sent to me at my Billing Address shown on this Lease unless I give you a different address in writing.

**37. Other Terms.** Waiver. You may waive or delay enforcement of your rights under this Lease without affecting your rights on future defaults. Severability. Any part of this Lease that is not enforceable shall not affect the validity of the remainder of this Lease. Joint Liability. If more than one Lessee signs this Lease, each Lessee shall be jointly and severally liable for all obligations under this Lease. Choice of Law. Except as may otherwise be provided by law, this Lease will be subject to the laws of the state where I sign it. In the event that both parties agree not to arbitrate in accordance with Section 38 below, any dispute shall be brought in a court located in the state of Lessor's place of business. Entire Agreement. This Lease and other agreements I sign in connection with the lease of the Vehicle contain all of the agreements between the Lessor and me. This Lease contains the entire agreement between any assignee of this Lease and me. Any change to this Lease must be in writing and the Lessor, or any assignee of Lessor, and I must sign it. No oral changes are binding.

Maintaining Payments. I may not change or stop any Monthly Payments for any reason, even if I do not receive an invoice, and even if the Vehicle is stolen, destroyed, seized by the government or the court, experiences mechanical problems, or does not satisfactorily perform. Lessee's Warranties. I represent that my driver's license and the driver's license of any authorized driver has not been revoked or suspended within the last 5 years. I promise that I have given a true Amount Owed for any vehicle traded in. If the correct Prior Credit or Lease Balance is more than the amount shown in Section 4.B, I agree to pay you the excess amount upon demand. Personal Property. Lessor shall not be responsible at any time for any personal property in the Vehicle. Attorney's Fees and Legal Expenses. In this Lease, "attorney's fees and legal expenses" means attorneys fees and legal expenses incurred before and during any litigation or other proceeding (including any appellate proceeding) and in any bankruptcy proceeding. Escheatment. If for any reason you need to escheat any of my funds to an unclaimed funds department, you may retain such fee as is allowable per state law.

**38. Arbitration Clause**

**PLEASE REVIEW - IMPORTANT - AFFECTS OUR LEGAL RIGHTS**

**NOTICE:** Either you or I may choose to have any dispute between us decided by arbitration and not in a court or by jury trial. If a dispute is arbitrated, I will give up my right to participate as a class representative or class member on any Claim I may have against you including any right to class arbitration or any consolidation of individual arbitrations. Discovery and rights to appeal in arbitration are generally more limited than in a lawsuit, and other rights you and I would have in court may not be available in arbitration.

**"Claim"** broadly means any claim, dispute or controversy, whether in contract, tort, statute or otherwise, whether preexisting, present or future, between me and you or your employees, officers, directors, affiliates, successors or assigns, or between me and any third parties if I assert a Claim against such third parties in connection with a Claim I assert against you, which arises out of or relates to my credit application, purchase or condition of this Vehicle, this Lease or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Lease). Any Claim shall, at your or my election, be resolved by neutral, binding arbitration and not by a court action. However, "Claim" does not include any dispute or controversy about the validity, enforceability, coverage or scope of this Arbitration Clause or any part thereof (including, without limitation, the Class Action Waiver set forth below and/or this sentence); all such disputes or controversies are for a court and not an arbitrator to decide. But any dispute or controversy that concerns the validity or enforceability of the Lease as a whole is for the arbitrator, not

a court, to decide. In addition, "Claim" does not include any individual action brought by me in small claims court or my state's equivalent court, unless such action is transferred, removed or appealed to a different court. Moreover, this Arbitration Clause will not apply to any Claims that are the subject of (a) a class action filed in court that is pending as of the effective date of this Arbitration Clause in which I am alleged to be a member of the putative class (however, you and I will continue to be bound by any prior Arbitration Clause) or (b) a motion to compel arbitration filed by you against me before the effective date of this Arbitration Clause pursuant to a prior Arbitration Clause (however, you and I will continue to be bound by any prior Arbitration Clause).

**Class Action Waiver. Notwithstanding any other provision of this Lease or Arbitration Clause, if either you or I elect to arbitrate a Claim, neither you nor I will have the right: (a) to participate in a class action, mass action, private attorney general action or other representative action in court or in arbitration, either as a class representative or class member; or (b) to join or consolidate Claims with claims of any other persons. No arbitrator shall have authority to conduct any arbitration in violation of this provision. (Provided, however, that the Class Action Waiver does not apply to any lawsuit or administrative proceeding filed against you by a state or federal government agency even when such agency is seeking relief on behalf of a class of lessees including me. This means that you will not have the right to compel arbitration of any claim brought by such an agency). The Class Action Waiver is material and essential to the arbitration of any Claims between the parties and is nonseverable from this Arbitration Clause. If the Class Action Waiver is limited, voided or found unenforceable, then this Arbitration Clause (except for this sentence) shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. The parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

I may choose the American Arbitration Association ("AAA"), 120 Broadway, New York, NY 10271, www.adr.org, 1-800-778-7879 or JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, www.jamsadr.com, 1-800-352-5267 to administer the arbitration. The rules and forms of the AAA and JAMS may be obtained on their websites or by writing to these organizations at the addresses listed above. Either you or I may request an expedited hearing under the applicable rules. If the AAA and JAMS are unable or unwilling to serve as administrator, the parties may agree upon another administrator or, if they are unable to agree, a court shall determine the administrator. No company may serve as administrator, without the consent of all parties, if it adopts or has in place any formal or informal policy that is inconsistent with and purports to override the terms of this Arbitration Clause. If the chosen administrator's rules or other provisions of this Lease (including any other arbitration provision relating to this Lease) conflict with this Arbitration Clause, then the provisions of this Arbitration Clause shall control. If a party files a lawsuit in court asserting Claim(s) that are subject to arbitration and the other party files a motion to compel arbitration with the court which is granted, it will be the responsibility of the party prosecuting the Claim(s) to select an arbitration administrator in accordance with this paragraph and commence the arbitration proceeding in accordance with the administrator's rules and procedures.

Arbitrators shall be attorneys with at least ten years of experience or retired judges and shall be selected pursuant to the applicable rules. The arbitrator will not be bound by judicial rules of procedure and evidence that would apply in a court, nor by state or local laws that relate to arbitration proceedings. The arbitrator will honor statutes of limitation and claims of privilege recognized under applicable law. In determining liability or awarding damages or other relief, the arbitrator will follow the applicable substantive law, consistent with the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), that would apply if the matter had been brought in court, including, without limitation, punitive damages (which shall be governed by the Constitutional standards employed by the courts). The arbitrator may award any damages or other relief or remedies permitted by applicable law including equitable, temporary and/or provisional remedies. The arbitrator shall write a brief explanation of the grounds for the decision. Any arbitration hearing that I attend shall be conducted at a place reasonably convenient to where I reside. Any court having jurisdiction may enter judgment on the arbitrator's award.

In any arbitration that I have commenced against you, if the total amount of my Claim(s) is less than $25,000: (a) you will pay any and all fees of the administrator and/or the arbitrator if I make a written request for you to pay such fees; and (b) you will pay my reasonable attorneys' and expert witness fees and costs if and to the extent I prevail in the arbitration. Moreover, you will always bear any fees and costs (including administrator and arbitrator fees and reasonable attorneys' and expert witness fees and costs) that you are required to bear pursuant to the administrator's rules or applicable law. You will not seek reimbursement from me of any fees or costs (including administrator

2202L (09/18) (FL)                                    70680*1*LIB-FI

DEAL# 152409

and arbitrator fees and attorneys' and expert witness fees and costs) that you incur on your own behalf or pay on my behalf in connection with the arbitration.

This Lease involves interstate commerce and this Arbitration Clause and any arbitration hereunder shall be governed by the FAA and not by any state law concerning arbitration. However, the governing law as to the substantive issues of the Lease and Vehicle shall be the law of the state in which this Lease was executed. The arbitrator's award shall be final and binding on all parties, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000, any party can, within 30 days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the administrator. The panel shall reconsider a new any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this arbitration provision to "the arbitrator" shall mean the panel if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with the preceding paragraph. Any final decision of the appeal panel is subject to judicial review only as provided under the FAA.

You and I may retain any rights to self-help remedies, such as repossession. The exercise of any self-help remedies is not a "Claim" subject to arbitration, nor is any individual action in court by one party that is limited to preventing the other party from using a self-help remedy and that does not involve a request for damages or monetary relief of any kind. Neither you nor I waive the right to arbitrate by using self-help remedies. This Arbitration Clause shall survive any termination, payoff or transfer of this Lease, and shall also survive any bankruptcy to the extent consistent with applicable bankruptcy law. If any part of this Arbitration Clause, other than the Class Action Waiver, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

Notwithstanding any other provision for notice contained in the Lease, any arbitration Claim or other notice provided under the rules of the arbitration administrator will be given to you at the following address: If my Claim is against the Seller, I agree that notice of my Claim will be given to the Seller at the address specified in Section 1 of this Lease. If my Claim is against the Assignee as designated in this Lease, I agree that notice of my Claim will be given at 5550 Britton Parkway, Hilliard, OH 43026. If my Claim is against both Seller and Assignee, I agree that both Seller and Assignee will be notified of my Claim at the addresses indicated herein.

DEAL # 152409

## 39. LESSOR'S RIGHT TO CANCEL.

**Lessor's Right to Cancel.**

a. Lessor agrees to deliver the Vehicle to me on the date this Lease is signed by Lessor and me. I understand that it may take a few days for Lessor to verify my credit, locate a party willing to purchase this Lease on the exact terms of this Lease, and assign this Lease to a financial institution. I agree that Lessor has the number of days stated below to assign this Lease. I agree that if Lessor is unable to assign this Lease within this time period to any one of the financial institutions with whom Lessor regularly does business under an assignment acceptable to Lessor, Lessor may cancel this Lease.

b. If Lessor elects to cancel under this Lessor's Right to Cancel pursuant to Paragraph a. above, Lessor will give me written notice (or in any other manner in which actual notice is given to me. Upon receipt of such notice, I must immediately return the Vehicle to Lessor in the same condition as when leased, reasonable wear and tear excepted. Lessor must give me back all consideration Lessor has received in accordance with the terms of this Lease and/or other documents relating to the Vehicle when I return the Vehicle.

c. If I do not immediately return the Vehicle, Lessor may use any legal means to retake it back (including repossession) and I will be liable for all expenses incurred by Lessor in taking the Vehicle from me, including attorney's fees and legal expenses. While the Vehicle is in my possession, all terms of this Lease, including those relating to use of the Vehicle and insurance for the Vehicle, are in full force and I assume all risk of loss or damage to the Vehicle. I must pay all reasonable costs for repair of any damage done to the Vehicle while the Vehicle is in my possession.

d. In the alternative to returning the Vehicle, I may immediately purchase the Vehicle pursuant to Section 27 or for an amount agreed upon between Lessor and me, with other funds arranged by me, or I may immediately attempt to negotiate and sign a new lease agreement with Lessor based on different lease terms (for example, a larger capitalized cost reduction, a required cosigner, etc.); although, nothing stated herein obligates Lessor to do so or to waive Lessor's right to cancel this Lease and retake possession of the Vehicle as above provided.

e. The terms of this Lessor's Right to Cancel survive Lessor's cancellation of this Lease.

If Lessee and Co-Lessee, if applicable, sign here, the Lessor has the right to cancel within __12__ days.

X _____   X _____**N/A**_____
Lessee's Signature                   Co-Lessee's Signature

## 40. LESSEE NOTICES AND SIGNATURES

In this Section 40, "you" and "your" refer to the Lessee.

### THIS IS A LEASE AGREEMENT. THIS IS NOT A PURCHASE AGREEMENT. PLEASE REVIEW THESE MATTERS CAREFULLY AND SEEK INDEPENDENT PROFESSIONAL ADVICE IF YOU HAVE ANY QUESTIONS CONCERNING THIS TRANSACTION. YOU ARE ENTITLED TO AN EXACT COPY OF THE AGREEMENT YOU SIGN.

**By signing below, you acknowledge that:**

* This Lease is completely filled out;
* You have no ownership rights in the Vehicle unless and until you exercise your option to purchase the Vehicle;
* You have read all pages of this Lease carefully and agree to all of its terms; and
* You have received a completely filled in copy of this Lease.

X _____   X _____**N/A**_____
Lessee                                Lessee

**DANIEL SILVA FERRO**                **N/A**
By (Print Name & Title if Corporation)   By (Print Name & Title if Corporation)

## 41. GUARANTY

I jointly and severally guarantee payment and performance of all promises contained in this Lease. Upon default, Lessor may proceed immediately against me without first proceeding against the Lessee. My liability will be unconditional and will not be affected by any settlement, extension, renewal or modification of this Lease whether or not by operation of law. I waive all right to notices of every kind, including rights to demand and presentment. I agree to pay all expenses (including reasonable attorney's fees and legal expenses, as allowed by applicable law) you incur if you have to enforce this Guaranty.

Guarantor's Signature: X _____   Guarantor's Signature: X _____

Name _____                        Name _____

Address _____                     Address _____

## 42. LESSOR'S ACCEPTANCE AND ASSIGNMENT

By signing below, Lessor (1) accepts the terms, conditions and obligations of this Lease and (2) assigns all right, title and interest in the Vehicle and this Lease to the Assignee listed in Section 2 above. This Lease, including all amounts to become due under it, and any guaranty, are subject to the provisions of the Center Agreement between Lessor and BMW FS, "you" and "your" refer to the Lessee.

Lessor Name  **BMW OF FORT LAUDERDALE**        Signature of Authorized Representative _____

2202L (09/18) (FL)          **70680*1*LIB-FI**          01/11/2021  07:44 pm    7 of 7

# EXHIBIT C

May 9, 2021

Equifax Information Services, LLC
P.O. BOX 740256
Atlanta, GA 30348

Via Certified Mail Return Receipt Number: 7020 0090 0000 1549 1585

**Re: Collections Account; Account No.: 2XXXX Amount $250**

Name:           Daniel Ferro
Last 4 SSN:
Date of Birth:
Current Address:

Dear Equifax:

This is a dispute notice, according to 15 U.S.C. §1681i(a)(1), of incorrect information on my credit report.

Attached please find a copy of the relevant pages from my Equifax credit report dated January 19, 2021 . I am writing this letter to dispute the entry on my report pertaining to **Unnamed Collections** account number **2XXXX** in the amount of $250.

While working as a Tour Director for Globus in UT, I experienced multiple bites all over my body, numbering over 20, which was obvious I picked up at a hotel. On Sunday, May 14th 2017 I checked in at the Moab Regional Hospital to be treated. Upon checking in, I gave the hospital the Travelers Insurance Worker Compensation Case file number (FAE1667) and any other information they asked for, to be able to send the bill to the correct place. I asked and was guaranteed that the bill would be sent to Travelers Insurance Worker Compensation. I was diagnosed with Bed Bug Bites and treated by Dr. G Russell. Immediately I began to receive bills from Moab Reginal Hospital. I called the AR Services who was sending the bill in the beginning of November 2017 and gave them all the information necessary to send the bill to the correct place, Travelers Insurance Worker Compensation. On December 27th, 2017 I received a letter from A-1 Collection Agency, LLC, demanding a payment of $197.00, for the Moab Regional Hospital visit on 5/14/17. On March 7th, 2018, after speaking to Karen Hill, my case Manager for Travelers Insurance Worker Comp. for the 3rd time, I sent her a 2 page fax with the A-1 Collection Agency, LLC letter (Bill). After that, I received one or two more letters in 2018 and 2019 from the collection agency. I thought everything was taken care of until I discovered that A-1 Collection Agency , LLC sent the bill to my Equifax Credit Report.

I am writing you in the hopes that you will thoroughly investigate my dispute and delete this negative information from my credit file. I believe that the information I am providing you in this letter is enough for you to remove the negative information, however, if you need more information please contact me immediately. You can reach me at my cell phone ██████████████ I request that you conduct a reasonable reinvestigation to correct this inaccurate information within the time frame required by the Fair Credit Reporting Act ("FCRA") and further request a description of the procedure used to determine the accuracy and completeness of the information supplied in response to this dispute.

An attorney helped me write this letter to help me make sure I did all that I could do to obtain correction of this negative item on my credit report and that I fully comply with the law.

Sincerely,

Daniel Ferro

**CC**: No Address in Equifax Report
Certified Mail Return Receipt Number: _____

Collection accounts

● 

Original creditor:

$250

Balance updated -

### Account info

| | | | |
|---|---|---|---|
| Account name | - | Balance | $250 |
| Account number | 2XXXX | Balance updated | - |
| Original creditor | - | Original amount | - |
| Company sold | - | Paid off | 0% |
| Account type | Collection Account | Monthly payment | - |
| Date opened | Dec 27, 2017 | Past due amount | - |
| Account status | - | Terms | - |
| Payment status | Unpaid | Responsibility | Individual Account |
| Status updated | Jan 2021 | Your statement | - |

### Contact info

| | |
|---|---|
| Address | - |
| Phone number | - |

### Comments

-

# Fax

| To: | Karen Hill *TRAVELERS WORKER COMP.* | From: | Daniel Ferro |
|---|---|---|---|
| Fax: | 877-266-1419 | Pages: | 2 |
| Phone: | 407-388-2480 | Date: | 3/7/18 |
| Re: | FAE1667 | cc: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Hi Karen

I've been receiving a bill from Moab Valley Health Care concerning Claim Number FAE1667, now coming from A-1 Collection Agency, LLC.

Thank you for all your help.

Regards,

Daniel Ferro

* ORIGINAL CREDITOR: MOAB REGIONAL HOSPITAL
$ 250.00 — A1 COLLECTIONS

# AR Services

**AR Services**

A Hospital and Physician Billing Service
To Pay Your Account Online: www.ARServices.org

October 24, 2017

Daniel Ferro

Total Amount Due: $189.48

| Provider | Account # | Date of Service | Amount Owing |
|----------|-----------|-----------------|--------------|
| MOAB VALLEY HEALTHCARE | | 05/14/17 | $189.48 |

This is a reminder that the above named provider has placed your account(s) with AR Services, an extension of your provider's Business Office. If you are unable to pay in full, please contact our office to arrange an appropriate payment arrangement.

Financial Assistance & Charity Care are part of our services provided. Any patient may apply. For more information please contact an AR Services Representative at 888-828-0007.

**Payment Options:**
Online using check or credit card: at www.ARServices.org
Check: payable to AR Services with the coupon and envelope provided and mail to the address below
Card: complete coupon below and mail in envelope provided or call us at (888) 828-0007
In person: contact us at (888) 828-0007 for location of closest payment center

Partial payments received do not constitute a payment arrangement. Thank you for your prompt attention to this matter.

All payments which are returned due to insufficient funds or a closed bank account will be subject to a $20.00 processing fee pursuant to C.R.S. 13-21-109(b)(1).

**AR Services • PO Box 1927 • Grand Junction, CO 81502**

527-KWAONE20-414-06/10/16

*** **Please detach the lower portion and return with your payment** ***

527-KWAONE20-414



Y1F05F2F67

PO Box 1927
Grand Junction CO 81502
RETURN SERVICE REQUESTED

IF YOU WISH TO PAY BY CREDIT CARD, CIRCLE ONE AND FILL IN THE INFORMATION BELOW.

| CARD NUMBER | | EXP. DATE |
|---|---|---|
| CARD HOLDER NAME | | CVV |
| SIGNATURE | AMOUNT PAID | |

ARS Account #:  ABB731
Total Amount Due:  $189.48

002502092400498253411334268433321-1R1-Y1F05F2F67 527

527
Daniel Ferro



AR Services
PO Box 1927
Grand Junction CO 81502-1927



Y1F79BC9B0

**PO Box 1929**
Grand Junction CO 81502
ADDRESS SERVICE REQUESTED

# A-1 Collection Agency, LLC

715 Horizon Drive, Suite 201
Grand Junction, CO 81506
(970) 241-2075 • (800) 437-2831
En Espanol (866)986-3680
www.A1CollectionAgency.com

A-1 Collections

December 27, 2017

Account Number:
Re: MOAB VALLEY HEALTHCARE
Amt. Owed: $197.83

0008120024005703/90513426843321-1YA1-Y1F79BC9B0 379

379
Daniel Ferro

A-1 Collection Agency, LLC
PO Box 1929
Grand Junction CO 81502-1929

---

**\*\*\* Detach Upper Portion And Return With Payment \*\*\***

KWAONE10-003U

379-KWAONE10-003U-12/04/15

| Creditor | Regarding | Principal Amt. | Interest | Amt. Owed |
|----------|-----------|----------------|----------|-----------|
| MOAB VALLEY HEALTHCARE | | $189.48 | $8.35 | $197.83 |

Your creditor has referred your account to this office for collection.

You are hereby advised:

**Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receiving this notice that you dispute the validity of this debt or any portion of it, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verfication. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.**

**This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.**

**A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt.**

As of the date of this letter, you owe $$197.83. Because of interest that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check.

As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. But we will not submit a negative credit report to a credit reporting agency about this credit obligation until the expiration of the time period described above.

All payments which are returned due to insufficient funds or a closed bank account will be subject to a $20.00 processing fee pursuant to C.R.S. 13-21-109(b)(1).

**FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE
WWW.COAG.GOV/CAR**

KAREN HILL
407 - 388 - 2480
FAX 877 - 266 - 1419

13066

*A-1 Collection Agency, LLC • 715 Horizon Drive, Suite 201 • Grand Junction, CO 81506 • (800) 437-2831*

# *Moab Regional Hospital*

**450 West Williams Way**

Moab, UT 84532

*(435) 719-3500*

MOAB REGIONAL
H O S P I T A L

---

Patient: Daniel Ferro   Date: 05-14-2017   Time: 18:44:18       Page 1

**Instructions for: Daniel Ferro**
**Date: 05-14-2017     Your care provider was: G Russell, FNP**

INSECT BITES: (BED BUGS)
   You have been bitten by an insect.  These bites can cause two types of swelling:  an initial swelling due to insect saliva or injected poison, and a late reaction due to your body's allergic reaction.
   This initial local reaction may be uncomfortable but is not dangerous.  Often there's an itchy "hive" at the bite location.  This is treated with antihistamines, cold compresses, and resting the affected body part.
   The later reaction often develops about the second day.  The entire area becomes very swollen, red, itchy, and tender.  This is an allergic reaction.  Your body is attacking the leftover insect saliva or venom.  This type of allergy is unpleasant, but not dangerous.  We treat this swelling with cortisone-type medicine.  Sometimes we use antibiotics if we're worried about infection.  Antihistamines help with the itch.
   If you develop a fever, chills, a red streak, or swollen glands in the area of the bite, infection may be starting.  Return at once.

   These are not contagious.  However, you should not take any bedding materials from the location where you acquired the bed bug bites.

   You may use Hydrocortisone Cream to the affected areas.

   Wash all your clothes.  Place your suitcase in a bag and in heat.

FOLLOW-UP CARE:
   You should contact your private physician for follow-up care in 5-7 days.  If you are unable to get a timely appointment, or if you are worsening, call us.

Keep in mind, due to the nature of emergency medicine diagnosis with 100% certainty is not always possible in the Emergency Department. Therefore, **if you find you are not getting better, your symptoms change or worsen, another diagnosis is possible and you must followup immediately!** If in the course of your treatment you have had X-rays or other imaging services performed, the Emergency Department Provider has preliminarily reviewed them. A Radiologist will perform a second reading of any such images obtained in the Emergency Department. If there is a finding that is different, you will be notified as soon as possible. Not all fractures or abnormalities are initially visible by X-ray. Sometimes, further X-rays or other tests are necessary for definitive diagnosis. Therefore, if you continue to experience ongoing symptoms of pain or swelling that are not improving, you should seek followup care.

I have received a copy of these instructions and have had an opportunity to discuss them. My questions have been answered. (Entiendo estas instrucciones y he recibido copia de ellas.)



_____        _____
Patient (or representative)                    Witness



$7.160
US POSTAGE
FIRST-CLASS
062S00137207
FROM 33843

B914567

CERTIFIED MAIL

7020 0090 0000 1549 1585

Equifax Information Services, LLC
P.O. Box 740256
Atlanta, GA 30348

DANIEL FERRO



U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage
$

Total P
$

Sent To    Equifax Information Services, LLC
Street a   P.O. Box 740256
City, St   Atlanta, GA 30348

PS Fo

7020 0090 0000 1549 1585

May 19, 2021

TransUnion Consumer Relations
P.O. BOX 2000
Chester, PA 19016-2000

Via Certified Mail Return Receipt Number: 7020 0090 0000 1549 1592

**Re: A 1 COLLECTNS MOAB REGIONAL HOSPITAL Date Open: Dec 27,2017**
**Amount: $250**

Name:              Daniel Ferro
Last 4 SSN:
Date of Birth:
Current Address:

Dear Trans Union:

This is a dispute notice, according to 15 U.S.C. §1681i(a)(1), of incorrect information on my credit report.

Attached please find a copy of the relevant pages from my Trans Union credit report dated January 19, 2021 . I am writing this letter to dispute the entry on my report pertaining to A 1 COLLECTNS account number **2XXXX** in the amount of $250.

While working as a Tour Director for Globus in UT, I experienced multiple bites all over my body, numbering over 20, which was obvious I picked up at a hotel. On Sunday, May 14th 2017 I checked in at the Moab Regional Hospital to be treated. Upon checking in, I gave the hospital the Travelers Insurance Worker Compensation Case file number (FAE1667) and any other information they asked for, to be able to send the bill to the correct place. I asked and was guaranteed that the bill would be sent to Travelers Insurance Worker Compensation. I was diagnosed with Bed Bug Bites and treated by Dr. G Russell. Immediately I began to receive bills from Moab Reginal Hospital. I called the AR Services who was sending the bill in the beginning of November 2017 and gave them all the information necessary to send the bill to the correct place, Travelers Insurance Worker Compensation. On December 27th, 2017 I received a letter from A-1 Collection Agency, LLC, demanding a payment of $197.00, for the Moab Regional Hospital visit on 5/14/17. On March 7th, 2018, after speaking to Karen Hill, my case Manager for Travelers Insurance Worker Comp. for the 3rd time, I sent her a 2 page fax with the A-1 Collection Agency, LLC letter (Bill). After that, I received one or two more letters in 2018 and 2019 from the collection agency. I thought everything was taken care of until I discovered that A-1 Collection Agency, LLC sent the bill to my TransUnion Credit Report.

I am writing you in the hopes that you will thoroughly investigate my dispute and delete this negative information from my credit file. I believe that the information I am providing you in this letter is enough for you to remove the negative information, however, if you need more information please contact me immediately. You can reach me at my cell phone ███████████ I request that you conduct a reasonable reinvestigation to correct this inaccurate information within the time frame required by the Fair Credit Reporting Act ("FCRA") and further request a description of the procedure used to determine the accuracy and completeness of the information supplied in response to this dispute.

An attorney helped me write this letter to help me make sure I did all that I could do to obtain correction of this negative item on my credit report and that I fully comply with the law.

Sincerely,

Daniel Ferro

CC:
A 1 COLLECTNS
PO BOX 1929
GRAND JUNCTION, CO 81502

Certified Mail Return Receipt Number: 7020 0090 0000 1549 1608

**Open accounts**

●A1 COLLECTNS

Unknown payment history

$250

Balance updated Jan 08, 2021

**Ε Account info**

| Account name | A1 COLLECTNS | Balance | | $250 |
|---|---|---|---|---|
| Account number | 2XXXX | Balance updated | | Jan 08, 2021 |
| Original creditor | MOAB REGIONAL HOSPITAL | Original amount | | - |
| Company sold | - | Paid off | | 0% |
| Account type | Open account | Monthly payment | | - |
| Date opened | Dec 27, 2017 | Past due amount | | - |
| Account status | - | Terms | | - |
| Payment status | - | Responsibility | | Individual account |
| Status updated | Jan 2021 | Your statement | | - |

**▥ Payment history**

No payments have been reported on this account.

**▣ Contact info**

Address         PO BOX 1929 GRAND JUNCTION,
                CO 81502

Phone number    (970) 241-2075

**▤ Comments**

Placed for collection

# Fax

| To: | Karen Hill *TRAVELERS WORKER COMP.* | From: | Daniel Ferro |
|-----|-----|-----|-----|
| Fax: | 877-266-1419 | Pages: | 2 |
| Phone: | 407-388-2480 | Date: | 3/7/18 |
| Re: | FAE1667 | cc: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Hi Karen

I've been receiving a bill from Moab Valley Health Care concerning Claim Number FAE1667, now coming from A-1 Collection Agency, LLC.

Thank you for all your help.

Regards,

Daniel Ferro

* ORIGINAL CREDITOR: MOAB REGIONAL HOSPITAL
  $250.00 — A1 COLLECTIONS



**AR Services**
A Hospital and Physician Billing Service
To Pay Your Account Online: www.ARServices.org

October 24, 2017

Daniel Ferro

Total Amount Due: $189.48

| Provider | Account # | Date of Service | Amount Owing |
|----------|-----------|-----------------|--------------|
| MOAB VALLEY HEALTHCARE | | 05/14/17 | $189.48 |

This is a reminder that the above named provider has placed your account(s) with AR Services, an extension of your provider's Business Office. If you are unable to pay in full, please contact our office to arrange an appropriate payment arrangement.

Financial Assistance & Charity Care are part of our services provided. Any patient may apply. For more information please contact an AR Services Representative at 888-828-0007.

**Payment Options:**
Online using check or credit card: at www.ARServices.org
Check: payable to AR Services with the coupon and envelope provided and mail to the address below
Card: complete coupon below and mail in envelope provided or call us at (888) 828-0007
In person: contact us at (888) 828-0007 for location of closest payment center

Partial payments received do not constitute a payment arrangement. Thank you for your prompt attention to this matter.

All payments which are returned due to insufficient funds or a closed bank account will be subject to a $20.00 processing fee pursuant to C.R.S. 13-21-109(b)(1).

**AR Services • PO Box 1927 • Grand Junction, CO 81502**

527-KWAONE20-414-06/10/16
527-KWAONE20-414

*** Please detach the lower portion and return with your payment ***

Y1F05F2F67

IF YOU WISH TO PAY BY CREDIT CARD, CIRCLE ONE AND FILL IN THE INFORMATION BELOW.

PO Box 1927
Grand Junction CO 81502
RETURN SERVICE REQUESTED

| CARD NUMBER | | EXP. DATE |
|---|---|---|
| CARD HOLDER NAME | | CVV |
| SIGNATURE | | AMOUNT PAID |

ARS Account #:
Total Amount Due:        $189.48

0026020002400498263133420843321-1R1--Y1F05F2F67 527
527
Daniel Ferro



AR Services
PO Box 1927
Grand Junction CO 81502-1927



Y1F79BC9B0

**A-1 Collection Agency, LLC**

PO Box 1929
Grand Junction CO 81502
ADDRESS SERVICE REQUESTED

A-1 Collections

715 Horizon Drive, Suite 201
Grand Junction, CO 81506
(970) 241-2075 • (800) 437-2831
En Espanol (866)986-3680
www.A1CollectionAgency.com

December 27, 2017

Account Number: ███████
Re: MOAB VALLEY HEALTHCARE
Amt. Owed: $197.83

000812002400570379053342B843321-1YA1~Y1F79BC9B0 379

379
Daniel Ferro
████████████████

A-1 Collection Agency, LLC
PO Box 1929
Grand Junction CO 81502-1929

---

*** Detach Upper Portion And Return With Payment ***

KWAONE10-003U

379-KWAONE10-003U-12/04/15

| Creditor | Regarding | Principal Amt. | Interest | Amt. Owed |
|---|---|---|---|---|
| MOAB VALLEY HEALTHCARE | ████████ | $189.48 | $8.35 | $197.83 |

Your creditor has referred your account to this office for collection.

You are hereby advised:

**Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receiving this notice that you dispute the validity of this debt or any portion of it, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verfication. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.**

**This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.**

**A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt.**

As of the date of this letter, you owe $$197.83. Because of interest that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check.

As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. But we will not submit a negative credit report to a credit reporting agency about this credit obligation until the expiration of the time period described above.

All payments which are returned due to insufficient funds or a closed bank account will be subject to a $20.00 processing fee pursuant to C.R.S. 13-21-109(b)(1).

**FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COAG.GOV/CAR**

KAREN HILL
407 - 388 - 2480
FAX 877 - 266 - 1419

13066

**A-1 Collection Agency, LLC • 715 Horizon Drive, Suite 201 • Grand Junction, CO 81506 • (800) 437-2831**



# Moab Regional Hospital
## 450 West Williams Way
Moab, UT 84532
*(435) 719-3500*

---

Patient: Daniel Ferro    Date: 05-14-2017   Time: 18:44:18      Page 1

## Instructions for: Daniel Ferro
## Date: 05-14-2017    Your care provider was: G Russell, FNP

INSECT BITES: (BED BUGS)
   You have been bitten by an insect. These bites can cause two types of swelling: an initial swelling due to insect saliva or injected poison, and a late reaction due to your body's allergic reaction.
   This initial local reaction may be uncomfortable but is not dangerous. Often there's an itchy "hive" at the bite location. This is treated with antihistamines, cold compresses, and resting the affected body part.
   The later reaction often develops about the second day. The entire area becomes very swollen, red, itchy, and tender. This is an allergic reaction. Your body is attacking the leftover insect saliva or venom. This type of allergy is unpleasant, but not dangerous. We treat this swelling with cortisone-type medicine. Sometimes we use antibiotics if we're worried about infection. Antihistamines help with the itch.
   If you develop a fever, chills, a red streak, or swollen glands in the area of the bite, infection may be starting. Return at once.

   These are not contagious. However, you should not take any bedding materials from the location where you acquired the bed bug bites.

   You may use Hydrocortisone Cream to the affected areas.

   Wash all your clothes. Place your suitcase in a bag and in heat.

FOLLOW-UP CARE:
   You should contact your private physician for follow-up care in 5-7 days. If you are unable to get a timely appointment, or if you are worsening, call us.


Keep in mind, due to the nature of emergency medicine diagnosis with 100% certainty is not always possible in the Emergency Department. Therefore, **if you find you are not getting better, your symptoms change or worsen, another diagnosis is possible and you must followup immediately!** If in the course of your treatment you have had X-rays or other imaging services performed, the Emergency Department Provider has preliminarily reviewed them. A Radiologist will perform a second reading of any such images obtained in the Emergency Department. If there is a finding that is different, you will be notified as soon as possible. Not all fractures or abnormalities are initially visible by X-ray. Sometimes, further X-rays or other tests are necessary for definitive diagnosis. Therefore, if you continue to experience ongoing symptoms of pain or swelling that are not improving, you should seek followup care.


I have received a copy of these instructions and have had an opportunity to discuss them. My questions have been answered. (Entiendo estas instrucciones y he recibido copia de ellas.)


_____                    _____
Patient (or representative)                                          Witness





$7.16
US POSTAGE
FIRST-CLASS
062S001272071
FROM 33843

B93466.05

CERTIFIED MAIL

7020 0090 0000 1549 1592

TransUnion Consumer Relations
P.O. Box 2000
Chester, PA 19016-2000

DANIEL FERRO

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postage
$

Total
$

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

Postmark
Here

TransUnion Consumer Relations
P.O. Box 2000
Chester, PA 19016-2000

PS

See Reverse for Instructions

7020 0090 0000 1549 1592



$7.160
US POSTAGE
FIRST-CLASS
062S0013272071
FROM 33843
B93456.06

CERTIFIED MAIL

7020 0090 0000 1549 1608

A 1 Collections
P.O. Box 1929
Grand Junction, CO 81502

DANIEL FERRO



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage
$

Sent To
A 1 Collections

Street and
P.O. Box 1929

City, State
Grand Junction, CO 81502

Postmark
Here

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7020 0090 0000 1549 1608

# EXHIBIT D

May 19, 2021

**A-1 COLLECTION AGENCY**

715 Horizon Drive Suite 201
Grand Junction, CO 81506
970-241-2075 or 1-800-437-2831
Fax 970-245-4484
www.A1CollectionAgency.com

Daniel Ferro

▮▮▮▮▮▮▮▮▮▮ 33426

Re: 2XXXX

Dear Daniel Ferro

Our offices are in receipt of your letter of dispute post marked 5/10/2021 and request for verification pursuant to 15 U.S.C. § 1692g of the Fair Debt Collection Practices Act. Please be advised we have contacted our client, Moab Regional Hospital, who has confirmed the name and address listed on the account as well as the amount owed. Please find attached an itemization of services provided. This itemization does not include applicable interest since charge-off.

Should you have any questions regarding this account or if you wish to discuss payment arrangements, please feel free to contact us at the number listed below. We look forward to helping you resolve this matter.

Best Regards,

A-1 Collection Agency
(800)437-2831

This communication is from a debt collector.



# Moab Regional Hospital

PO Box 998, Moab, UT 84532 Phone 1-435-719-3500

## Account Information as on 05/19/2021

### Patient Details

| | | | | |
|---|---|---|---|---|
| Patient No | : | | Financial Class | : S7 - Self Pay AR Services |
| Patient Name | : FERRO, DANIEL | | Patient Status | : |
| SSN | : - - | | Age (Years) | : 60 |
| Attending Physician | : RUSSELL, GEORGIA G | | Birth Date | : |
| Surgeon | : | | Admit Date | : 5/14/2017 17:10 |
| Consultant | : RUSSELL, GEORGIA G | | Discharge Date | : 5/14/2017 18:45 |

### Guarantor Details

| | | | | |
|---|---|---|---|---|
| Guarantor No | : | | Home Phone | : 1-4 |
| Guarantor Name | : FERRO, DANIEL | | Employer | : OTHER |
| SSN | : - - | | | |
| Address | : | | | |
| | 33426 | | | |

### Payment Details

| | | | | |
|---|---|---|---|---|
| Current Balance | : $ 189.48 | | Last Pay Amt | : |
| Total Charges | : $ 386.00 | | Last Pay Date | : |

### Insurance Details

| | |
|---|---|
| 1st Insurance | : UMR-UNITED MEDICAL RESOURCES |
| UB 92 Filed Date | : 6/30/2017 06:46 |
| HCFA Filed Date | : 9/15/2017 12:21:00PM |
| Policy No | : |
| Group No | : |

| | |
|---|---|
| 2nd Insurance | : |
| UB 92 Filed Date | : |
| HCFA Filed Date | : 9/15/2017 12:21 |
| Policy No | : |
| Group No | : |

| | |
|---|---|
| 3rd Insurance | : |
| UB 92 Filed Date | : |
| Policy No | : |
| Group No | : |

**Patient No    :** ▐▐▐▐▐▐▐▐
**Patient Name :**  FERRO, DANIEL

| Date | Description | Amount |
|---|---|---|
| 10/23/2017 | Transfer To Bad Debt | 189.48 |
| 08/29/2017 | Transfer To Collection from AR | 189.48 |
| 08/29/2017 | Fin. Cls. Changed from OS to S7 | 0.00 |
| 08/07/2017 | Fin. Cls. changed from (S3) to (OS) | 0.00 |
| 08/03/2017 | Statement Printed: | |
| 07/14/2017 | Co-payment | |
| 07/14/2017 | Coinsurance | |
| 07/14/2017 | COMMERCIAL INSURANCE | -157.92 |
| 07/14/2017 | COMM INS ADJUSTMENT | -38.60 |
| 07/14/2017 | Fin. Cls. Changed from I1 to S3 | |
| 06/30/2017 | UMR 30541 UB-04 Printed | 386.00 |
| 06/30/2017 | UMR 30541 UB-04 Downloaded | 386.00 |
| 05/26/2017 | Bill posted for FERRO, DANIEL | 386.00 |

### CHARGE HISTORY

| Date | Description | Units | Rate | Total Charge |
|---|---|---|---|---|
| 05/14/2017 | ER SERVICE LEVEL 2 | 1 | 386.00 | 386.00 |
| | | | Total: | **$386.00** |

### CLAIMS HISTORY

| Date | Description | Amount |
|---|---|---|
| 06/30/2017 | UMR 30541 UB-04 Printed | 386.00 |
| 06/30/2017 | UMR 30541 UB-04 Downloaded | 386.00 |